139 So. 229

# HORTICULTURAL DEVELOPMENT CO. v. LARK.

## 1 Div. 680.

Supreme Court of Alabama.

Jan. 21, 1932.

W. J. Young, of Mobile, for appellee.

Gordon, Edington & Leigh, of Mobile, for appellant.

**BROWN, J.**

By the bill in this case the complainant seeks, through equitable attachment, to subject to the satisfaction of its alleged claim, the alleged equitable interest of the defendant in a ten-acre tract of land located in the county of Mobile, which the defendant agreed to purchase from the complainant at and for the sum of $12,000.

The bill alleges that the purchase money has been paid in full by the defendant; that a deed to the same has been tendered to him, which he has refused to accept.

The bill further avers that in said contract "it was agreed that the complainant should cultivate and care for the property which was to be developed as a Satsuma orange and pecan grove, and to harvest and market the crops grown thereon, and which the complainant has continuously done in accordance with said contract subsequent to the execution thereof"; that the complainant's claim amounting to $1,556.02 accrued under the following provisions of said contract:

"The cost of cultivation, spraying, fertilization, care and upkeep, including the cost of repairs and replacements of implements and animals used by the Company, shall be paid by the Purchaser in the amount per acre determined by the Company each year, estimating the aggregate cost of upkeep of all groves of the same year's planting which are to be cultivated that season, divided by the total number of acres constituting that particular annual bearing unit; provided, however, these costs of upkeep shall not be charged against the Purchaser for the term ending December 31st, of the Sixth growing season after the date of this contract.

"Each year the Company shall retain out of the proceeds of the Purchaser's share of the crop any amount due the Company from the Purchaser then remaining unpaid, including taxes and a sufficient sum to meet Purchaser's obligation to pay all estimated costs of upkeep of this grove for the succeeding season and taxes; otherwise such amount shall be paid by the Purchaser to the Company on demand; and if the Purchaser pays estimated expenses which prove to be in excess of the actual expenses, then the Purchaser shall receive credit for such excess, and if such estimated expenses prove to be less than the actual expenses for that season, then the Purchaser shall pay the Company on demand an amount to make good the deficiency thereof."

After demurrer to the bill was overruled, the defendant filed a special plea thereto, setting out the contract in haec verba, asserting that the contract is void as against public policy; that the reservations in the contracts are inconsistent with the agreement which contemplated a sale of a fee-simple estate; that it violates the rules against perpetuities, in that vesting of the estate agreed to be sold is made to depend upon the exercise of a reserved judgment and discretion to be exercised by the seller in the future, and denies to the defendant any control over the property or any right to the usufruct thereof pending the exercise of such discretion and judgment; that the contract is unconscionable, and one that a court of equity should not enforce.

On the hearing the plea was held sufficient, and without proof of its averments, the court entered a decree dismissing the bill; hence this appeal.

There is some confusion in the record resulting from the recitals in the order of submission, and in the decree following. In the first named, it is recited that the cause "is submitted for decree on the sufficiency of the defendant's plea," and the decree recites that: "This cause coming on to be heard upon the bill of complaint and the pleas filed by the respondent to the whole of the bill of complaint, said pleas setting out the entire contract, the basis of said suit, and complainant having filed no objection or exception thereto, but *took issue thereon*, and said cause having been also submitted upon the oral agreement of solicitors that if the court held said pleas to be insufficient, that an order of reference to ascertain the amount due complainant in this cause be made," etc.

The appellant assigns two errors: (1) That the court erred in holding the plea sufficient, and (2) the court erred in dismissing the bill.

■ If the bill has equity and the recitals in the order of submission and in the decree itself be construed as a submission of the cause on its merits, error clearly intervened in the dismissal of the bill. The effect of the

plea was to confess the averments of the bill and put the defendant to proof of his plea. Prowell v. Wilson, 219 Ala. 645, 123 So. 38.

But we are relieved of this difficulty by appellant's waiver of the second assignment of error in the supplemental brief filed, in which it disclaims any purpose to insist that the dismissal of the bill was error to reverse, if the plea is held sufficient, for the reason no doubt that it recognizes that the plea correctly sets out the contract, and to prove the plea the defendant would only have to offer the contract in evidence. That we may not be misunderstood, we quote the language of the supplemental brief: "The appellee has filed a supplemental brief apparently in great fear that this Court would rule that the dismissal of the bill might be held error because he had not proved the plea. We are not urging any such conclusion to this Court, but are seeking to have this Court determine on the bill and the plea, the soundness of the contract to the extent of the period fixed by this jurisdiction under such circumstances, and in the absence of statute."

The equity of the bill rests upon two elements: First, under the terms of the contract the defendant obligated himself to pay all deficits between the cost and expense of complainant's operations in the planting, cultivation, gathering, and marketing of the products of the property, including the replacement of machinery and animals incident thereto, as pooled with other properties owned by the complainant and others, constituting a planting unit, and left indefinite in quantity and area, depending on the judgment and discretion of the complainant, and what is derived from the sale of the products of the property pooled with such other properties, after the lapse of six growing seasons; and, second, upon the fact that it seeks to subject to the payment of complainant's asserted claim an assumed equitable interest of the defendant in the property. Therefore, the bill, if not in form, is in substance one to compel specific performance of the contract by the defendant.

■ If we understand appellant's major contention, it is this: That the contract contemplated that the complainant would sell and the defendant would purchase a fee-simple title to the property in question, incumbered only by the reservation on the part of the complainant to retain possession, control, and use of the property for specific purposes for a term of nine hundred and ninety-nine years, and conceding that the reservation was for an unreasonable time, the court should apply the rules of construction applicable to leases made for a term in contravention of the statute, and analogous rules in respect to public service contracts, and hold the reservation valid for a reasonable time, citing, in support of this contention,

Robertson v. Hayes, 83 Ala. 290, 3 So. 674; Trammell v. Chambers County, 93 Ala. 388, 9 So. 815; Mobile Electric Co. v. City of Mobile, 201 Ala. 607, 79 So. 39, L. R. A. 1918F, 667.

The appellant frankly concedes that said reservations do not constitute a leasehold, and the difficulty here is that in respect to leases the statute fixes the limitation of the term, and furnishes a basis for the rules of interpretation and limitation. The same was true in respect to the contract in Trammell v. Chambers County, supra. And in Mobile Elec. Co. v. City of Mobile, supra, involving a contract by a public service corporation, the court applied the limitation prescribed by section 228 of the Constitution of 1901, limiting the granting of franchises to a term of thirty years.

To apply those rules to the contract in hand would be to make a contract for the parties which they did not make for themselves. Mobile Elec. Co. v. City of Mobile, supra.

■ The appellant's next contention is that the contract contemplated that the delivery of a deed in accordance therewith would vest in the purchaser a title in fee simple. It is well settled that where an estate is expressly granted, and there follows a reservation, exception, or condition which destroys the grant, it is void, being repugnant to the thing first granted. Pynchon v. Stearns, 11 Metc. (Mass.) 312, 45 Am. Dec. 210; Cutler v. Tufts, 3 Pick. (Mass.) 272; 4 Thompson on Real Property, 376, § 3268; 18 C. J. 337, § 337.

So, to sustain this contention would result in holding the reservations in the contract, which were to be embodied in the deed, and which are clearly repugnant to such a grant, void.

Appellant's further contention is that the contract does not violate the rules against perpetuities for the reason that it contemplated that the estate would vest eo instante upon the delivery of a deed to the defendant.

This, we regard as the crucial point in the case and must be solved by the interpretation of the contract.

It is clear that what the complainant undertook to sell and the defendant proposed to buy was not the naked ten-acre tract of land, but an orange and pecan grove ten acres in area, not then in existence, but to be brought into existence by the efforts of the complainant, its successors or assigns. It is also clear that the possession of the tract of land was not to be delivered with the deed, but was to be retained by the seller, its successors and assigns, for a term of nine hundred and ninety-nine years, and throughout this term the seller, its successors and assigns, are to retain absolute control and dominion over the property, to be managed and controlled as "an integral part of all groves planted by

the Company in the same year as that in which the Purchaser's grove was planted, which total acreage planted by the Company * * * shall thereafter be treated and known as a particular annual bearing unit. The Purchaser's proportion of any expense or profit will be that percentage of the amount of the total expense of, or net proceeds from, that particular annual bearing unit, which is represented by the percentage his planted acreage is of the entire planted acreage comprising that particular annual bearing unit."

In that part of the contract designated "Terms, Conditions and Covenants," we find the following:

"As soon as the *Company shall be satisfied* that the condition of the grove of the annual bearing unit, of which this property is a part will warrant the sale of a crop at a profit over the cost of harvesting and marketing, the Company shall harvest and market such crop and account for Purchaser's proportionate part thereof as hereinafter provided.

"The Company shall cultivate, fertilize, spray, care for and keep up this property, and gather and market all crops therefrom for a term of nine hundred and ninety-nine (999) years from the date of this contract, to the exclusion of any one else, *at the cost of the Purchaser which the Purchaser agrees to pay,* provided that the Purchaser shall not pay any of such costs for the first six growing seasons of this contract except for such costs as shall be incurred by the Company in gathering and marketing the crops grown thereon.

"The cost of cultivation, spraying, fertilization, care and upkeep, including the cost of repairs and replacements of implements and animals used by the Company, shall be paid by the Purchaser in the amount per acre *determined by the Company* each year, estimating the aggregate cost of upkeep of all groves of the same year's planting which are to be cultivated that season, divided by the total number of acres constituting that particular annual bearing unit; provided, however, these costs of upkeep shall not be charged against the Purchaser for the term ending December 31st of the Sixth growing season after the date of this contract.

"Each year the Company shall retain out of the proceeds of the Purchaser's share of the crop any amount due the Company from the Purchaser then remaining unpaid, including taxes and a sufficient sum to meet Purchaser's obligation to pay all estimated costs of upkeep of this grove for the succeeding season and taxes; otherwise such amount shall be paid by the Purchaser to the Company on demand; and if the Purchaser pays estimated expenses which prove to be in excess of the actual expenses, then the Purchaser shall receive credit for such excess, and if such estimated expenses prove to be less than the actual expenses for that sea-

son, then the Purchaser shall pay the Company on demand an amount sufficient to make good the deficiency thereof.

"During the entire term of this contract the Purchaser shall pay all costs of harvesting and marketing the crops on this property; and in order to procure a better market price each season the Company *shall pool all crops gathered from all of the property under its control and shall market these crops in the aggregate;* and the average price per box each season realized from all the crops marketed by the Company and the average cost per box of harvesting and marketing such crops shall be used as the basis of computation of the Purchaser's portion of the proceeds of such crops.

"In the computation of the Purchaser's profits the Company shall deduct from the Purchaser's portion of the proceeds of such crops as provided in the preceding paragraph, Purchaser's share of the costs of upkeep of the annual bearing unit of which Purchaser's grove is a part computed on the acreage ratio which Purchaser's property bears to the total acreage of the annual bearing unit planted in the same year as Purchaser's grove together with any amount due the Company from the Purchaser then remaining unpaid. * * *

"It is mutually covenanted and agreed by the Purchaser and the Company that the Purchaser *shall accept the title to the Company* described in this contract, subject to the exclusive right which the Company hereby reserves in itself, its successors and assigns to operate said property as a Satsuma orange and pecan grove, and to cultivate and care for the same, and to gather and market all products grown thereon for a term of nine hundred ninety-nine (999) years from the date of this contract for the remuneration, at the expense and under the conditions as are hereinabove set out and defined, all of which exclusive rights so retained by the Company shall be provided for in the deed executed by the Company, as a reservation therein," etc. (Italics supplied.)

■ Under the early English common law, "livery of seisin" was essential to the vesting of title in the enfeoffee, and while this ceremony has been displaced by the law that gives effect to the delivery of a deed, when the parties so intend, as passing title with the immediate right of possession, the old ceremony of "livery of seisin" has not been without influence, for until the adoption of the Code of 1907, deeds made and delivered while a third party was in adverse possession, while valid as between the parties, were void as to such third party, and would not support an action of ejectment. Davis v. Curry, 85 Ala. 133, 4 So. 734; Grayson v. Muckleroy, 220 Ala. 182, 124 So. 217; 3 Thompson on Real Property, §§ 2650, 2651.

200

The statute, Code 1923, § 6900, provides that, "Every estate in lands is to be taken as a fee simple, although the words necessary to create an estate of inheritance are not used, *unless it clearly appears that a less estate was intended.*" Yet if it appears that a freehold estate was not intended, the intention of the parties will govern. Slaughter et al. v. Hall et al., 201 Ala. 212, 77 So. 738.

In the body of the contract we find this provision: "Upon satisfaction of full payment of the purchase price, you agree to execute and deliver to me *or my legally designated heirs,* a sufficient deed conveying the title *to said grove* free and clear of any encumbrances *except the rights by you reserved according to terms, reservations and conditions of this contract.*" (Italics supplied.)

Taking the contract as a whole, our conclusion is that it was not contemplated that any estate or beneficial interest in *the grove* should vest upon the payment of the purchase money or upon the execution and delivery of a deed thereunder; that the reservations covered the entire substance of the estate, possession, control, use, and benefits, retained in the seller, leaving nothing to the purchaser except the burden of paying deficits; and that the purchaser's right and interest were contingent upon the determination by the company that "the condition of the grove of the annual bearing unit, of which this grove is a part, will warrant the sale of a crop at a profit over the cost of harvesting and marketing."

Looking through form to substance, as a court of equity must do, the manifest and dominant purpose of the contract was to tie up the property in such manner that it would be inalienable by the purchaser, and while the seller, the company, might become satisfied "that the condition of the grove of the annual bearing unit, of which this grove is a part," would warrant the sale of a crop at a profit, within the time permissible under the rules against perpetuities, so as to vest in the purchaser an estate of doubtful value, nevertheless it might not occur within such time, and the entire contract must be adjudged void as against public policy. Lyons et al. v. Bradley, 168 Ala. 505, 53 So. 244; 21 R. C. L. pp. 288, 289, §§ 10, 11; Ould v. Washington Hospital, etc., 95 U. S. 303, 24 L. Ed. 450.

Our judgment, therefore, is that the decree of the circuit court holding the plea sufficient is free from error, and appellant having waived its second assignment of error, the decree is due to be affirmed. It is so ordered.

Affirmed.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.