176 So. 799

**MIDGLEY et al. v. RALLS et al.**

**7 Div. 453.**

Supreme Court of Alabama.

Nov. 4, 1937.

686

Culli, Culli & Swann, of Gadsden, and Hill, Hill, Whiting & Rives, of Montgomery, for appellants.

Goodhue & Lusk, Roger C. Suttle, and O. R. Hood, all of Gadsden, for appellees.

BROWN, Justice.

This appeal is from the final decree of the circuit court, sitting in equity, denying to complainants relief and dismissing their bill. The ground on which the decree is rested is that the complainants failed to meet and carry the burden of proof imposed by the bill's material averments.

The bill is one in the nature of a bill of review, filed by the minor children of Charles H. Midgley, deceased, through and by their next friend and guardian, to vacate, set aside, and annul a former decree of the court, authorizing the register of the court to execute in their name a mortgage on valuable business property in the city of Gadsden, which complainants inherited from their deceased father, to secure an alleged temporary loan and for future advances, for the support, maintenance, and education of said minors, and the protection of their property; and to set aside, vacate, and annul said mortgage, the foreclosure thereof, and the deed executed in pursuance of the foreclosure by the Gadsden National Bank to itself as the purchaser at the foreclosure sale, and for a sale of said property for division among the joint owners.

Upon full review and consideration of the competent and legal evidence, to our

minds the conclusion is irresistible that the circuit court erred in denying the complainants relief and dismissing their bill.

We now state briefly the controlling facts leading to this conclusion.

Midgley, the father of the complainants, died intestate, October 12, 1924, leaving surviving him, his widow, and said complainants, a girl and a boy, respectively, seven and six years of age, and an estate consisting of improved real property in the city of Gadsden, estimated to be worth about $50,000. This included a residence on Turrentine avenue in one of the best residential districts. The rent income from the property, not including the residence, was from $1,600 to $1,800 per annum.

The property was unincumbered, and his debts all paid.

In December, 1926, Midgley's widow, the mother of complainants, married Howard L. Ralls, who was at that time, and for a number of years prior thereto, the cashier of the Gadsden National Bank, in general charge over the bank under the supervision of its officers and directors. Ralls had two boys, and, after the marriage, with these boys moved into the Midgley residence, and there Ralls and his two boys, and Mrs. Ralls with her two children lived as one family, without paying rent therefor. Thereafter, three more children, the issue of said marriage, were born to the Ralls.

By frequent surreptitious overdrafts, referred to in the testimony as loans, Ralls became indebted to the bank in the sum of $10,618.33, and Mrs. Ralls, as appears from the bank records was allowed to overdraw, without any authority except from her husband cashier, until her indebtedness amounted to $3,250.

The bank records show that three of these overdrafts or loans occurred on the same date, February 24, 1928, aggregating $720, some of them secured by hypothecated stocks, and, on the same date, three different "loans" were charged to Mrs. Ralls, aggregating $1,000. All of these several overdrafts or "loans" occurred between March 2, 1927, and August 31, 1931, on which date the overdrafts charged to Ralls amounted to $10,618.33, and the amount charged on the books to Mrs. Ralls, $3,250.

On the last-mentioned date the sum of $5,500 was transferred on the books, from Ralls' account, and charged on the account of Mrs. Ralls, boosting her indebtedness to $8,750, and Mrs. Ralls, her husband join-

ing therein, executed a mortgage to the bank on the Midgley home, estimated to be of the value of $15,000, and a one half undivided interest in business property situated in the city of Gadsden, also estimated to be of the value of $15,000, the bank being the owner of the other half interest. This mortgage was executed, recorded, and placed in the files of the bank without the knowledge of the other officials of the bank.

This defalcation of the cashier, taking as true the testimony offered by the defendants, was brought to the knowledge of the bank officials in the latter part of August, 1931, through an investigation by a committee appointed by the board at the suggestion of the chief examiner of banks.

When the amount of the indebtedness of Ralls and wife was reported to the board of directors, to quote from the testimony of the chairman of the committee "They were surprised at the amount of the debt and the question of security was discussed, and the matter was turned over to Mr. Hood. He represented the bank."

Another member of the board testified that "in the directors' meeting it was stated that this specific part of this debt—$8750.00 —that rightly belonged to the Midgley children would be charged against them". That the chairman of the investigating committee complained that the indebtedness of Mr. Ralls and Mrs. Ralls "was out of line and both of the loans were excessive." That the board designated Mr. Hollingsworth, the president of the bank "to handle the situation further with Mr. Ralls."

Hollingsworth testified: "Well, the final upshot was that the board demanded that the debts were (be) paid, or satisfactorily secured—that was the substance of it, and that (they) authorized or instructed me to confer with Mr. Ralls and see that matter was reported back if possible in a manner that would be satisfactory to the Board.

"Q. Was it discussed any further after that at that meeting? A. I guess it was discussed, but that was the final upshot.

"Q. After that meeting, either that night or the next day or later on, did you discuss the matter with Mr. Ralls? A. I called Mr. Ralls into the directors' room the next afternoon and had several talks with him— possibly extending over a week or ten days.

"Q. What did he tell you part of this money, or the larger portion was used for? A. He elaborated on that in his private

conversation to me—he made statements to the board, was about the substance of it. I talked to Howard not only as an official of the bank but I think that he felt that way, as a friend of 20 odd years of standing of him, and I called his attention to the fact that he had the authority and that it was especially important if he could either pay them off or make some satisfactory settlement with the board of directors, *because the matter involved him with the comptroller at Washington.* He never disputed that or denied it at all. He just told me from day to day that he would do everything he could to straighten it out. At last, after possibly a week or ten days— I would call him most every day and ask him what progress he was making. He said he would talk it over with his wife and see what could be done. The last conference we had he stated that he had talked the matter over with his wife and that she had consented to it to assist him in fixing the indebtedness up to the satisfaction of the board.

"Q. What was the next step that was taken? A. After that the next step, I think, Mr. Ralls and I went into Mr. Hood's office. After that I had nothing further to do with the matter." (Italics supplied.)

Mr. Hood testified: "I was a director of the Gadsden National Bank and its attorney until it closed on January 9, 1932. As the attorney for the Complainants, therein engaged by H. L. Ralls, I filed the bill in equity, a copy of which is attached to the original bill of complaint in this cause as Exhibit 1, and represented them in the proceedings following the filing of the bill.

"The first knowledge or information I had of the indebtedness of H. L. Ralls and Sallie B. Ralls to the Gadsden National Bank was obtained at a Directors' meeting of the bank in August, 1931, as I remember it, the fact being made known to that Directors' meeting that the two, H. L. Ralls and Sallie B. Ralls, owed the bank amounts aggregating the sum of between thirteen and fourteen thousand dollars.

"Mr. Ralls was present at that meeting and in response to questions propounded to him by me he stated that of the thirteen odd thousand dollars just spoken of, $8750.00 had been expended in the payment of taxes, discharge of street improvement liens, repairs and maintenance of the houses and properties of the two minor complainants and in their support, maintenance, education clothing and the like, stating, in effect that by adding all such items the sum of $8750.-00 was obtained. I do not recall that he stated the respective amounts due by each of them aggregating the $8750.00.

"He also made known to me, but I don't remember just whether it was at that particular directors' meeting or later, that he and his wife had executed a mortgage to the Gadsden National Bank, attempting to secure said $8750.00, and as I understood it, conveying the homestead, the title to which was in Charles Holley Midgley, the deceased former husband of Sallie B. Ralls, which homestead is located on Turrentine Avenue in the City of Gadsden, in which she had not claimed and had set apart to her a homestead interest, and, therefore, only had a quarantine right in it at the time of the execution of that mortgage, and which said mortgage also conveyed the undivided one-half interest in the lot conveyed in the mortgage sought to be cancelled in this suit.

"If I recollect correctly, Mr. Ralls stated that that mortgage was drawn by himself on a blank form of mortgage which was used by Inzer, Davis and Martin, in making loans.

"At that director's meeting and after Mr. Ralls had explained the loan to the Board of Directors and myself, I stated that if the facts were as stated by him to the Directors and myself at the directors' meeting, the two minor complainants were liable and indebted to the Gadsden National Bank in said amount of $8750.00 and a judgment for which amount, in my opinion, could be recovered against them in the courts; also that an equity court had the jurisdiction and power to authorize a loan to said minors in said amount to pay and discharge said liability and indebtedness to be secured by a mortgage conveying a reasonable amount of the real properties of said two minor complainants.

"Some time after the directors' meeting referred to, Mr. Hollingsworth, the President of the Bank, and Mr. H. L. Ralls, came to my office when Mr. Ralls substantially and in effect made the same statements which he had made at the Director's meeting except perhaps he elaborated the statements going more into detail, at which time I advised them that; if the minors were not in a position to pay the indebtedness at that time, that upon all the facts being made known to a court of equity, in my judgment, such a court would authorize the minors to borrow said amount of $8750.00

for the purpose of discharging said liability and indebtedness and of securing a loan by mortgage conveying a reasonable amount of the real estate of said minors.

"At that meeting between Mr. Hollingsworth and Mr. Ralls, on the one part and myself on the other, it was concluded that I should draft a bill to be filed by Mr. Ralls, as the next friend of the two minors, against Sallie B. Ralls, as the respondent, in which all the facts should be set up and the matter submitted to the Circuit Court of Etowah County, Alabama, in an effort to secure the consent and authority of the court to make said loan and to convey the real estate of the minors described in said bill of complaint in the mortgage sought to be cancelled. I prepared the bill of complaint, and at the same time prepared an answer to be made by Mrs. Ralls to it, in the event she concurred in the truthfulness of the averments of the bill, and in the event she did not employ counsel to represent her in the matter, stating to Mr. Ralls at the time that it was not necessary for her to procure counsel to represent her, if she agreed to the truthfulness of the facts set forth in the bill. I turned the two instruments over to Mr. Ralls, suggesting that he submit them to Mrs. Ralls for her approval or disapproval, and in the event of her approval, that she sign her name and in her behalf the answer to the bill of complaint.

"Some time after I prepared and delivered to Mr. Ralls the bill of complaint and Mrs. Ralls' answer to it, I believe the next day, he returned those papers to me, stating, in effect, that Mrs. Ralls agreed that the averments of the bill were true and that she had signed the answer. I also prepared for him an agreement between her and myself, as the attorney representing him as next friend to the complainants in the proceeding, and which agreement is exhibited to the original bill of complaint in this cause as Exhibit C. I also prepared the affidavits or depositions, as they are called, of H. L. Ralls, J. L. Herring and E. T. Hollingsworth and procured their oaths and signatures to the same.

"I then submitted to Judge O. A. Steele the original bill of complaint, answer of Mrs. Ralls to it, the agreement between her and myself, and the affidavits and depositions of the three persons just named. As I remember it, Judge Steele took the matter under consideration for several hours, stating to me at the time that he desired to confer with Mr. Ralls and possibly Mrs. Ralls, about the matter. Several hours afterward he made known to me the fact that he had concluded to award the relief prayed for in the bill, to authorize the making of the loan and the conveyance of said property of the two minors in and by the mortgage to secure it, and directed me to draw the final decree, stating to me the findings, orders and directions which he desired to be incorporated in it. I then prepared the decree, submitted it to him and, if I recollect correctly, he stated that he had satisfied himself that he should sign the decree and that it was to the interest of the minors, and he then signed it as Judge of the Circuit Court of Etowah County.

"After the decree was signed, I prepared the mortgage, which was signed by H. L. Ralls, and Sallie B. Ralls, and by Marjorie Louise Midgley, and Charles Holley Midgley by Walter M. Thompson, Register, a copy of which mortgage is exhibited to the original bill in this cause, as Exhibit 'F'. Upon the execution of the mortgage, I turned it over to the officers of the Gadsden Loan and Banking Company. I had nothing to do with the bookkeeping entries that were made by that company, or the Gadsden National Bank, and don't know just what entries were made in effectuating and completing the loan and transaction."

The purported consideration for the execution of the mortgage by the Register signing the name of the minors thereto, to the Gadsden Loan and Banking Company, was a loan of $8750.00, *"to the said minors for necessities furnished or to be furnished to said minors."* (Italics supplied.)

The decree purported to authorize the execution of a mortgage for $8750.00 *"to secure the funds to repay said Gadsden National Bank for the temporary loan made by it for the purpose of supporting, maintaining and educating said minor complainants,"* etc. (Italics supplied.)

The evidence is clear to the conclusion that not a cent was advanced by the named mortgagee to the Ralls or said minors, that the transaction, after the mortgage was given, was purely a matter of bookkeeping handled by the same persons who were the officers of both the bank and the loan company. The real consideration for the mortgage was, not to pay the debt of Ralls and wife to the bank incurred as heretofore stated, but to secure the payment of the same by an attempt to fasten a lien on the property of said minors.

Aside from the hearsay testimony, detailed by the defendant's witness, to which objections were noted, as to the statement of Ralls, the cashier, in the director's meeting while he was being investigated, there is no evidence showing that any part of the funds of the bank used by Ralls and wife was devoted to the education or maintenance of said minors. There was a scintilla of evidence tending to show that some part of said funds went to pay taxes on the property of the Midgley estate, but there is nothing in the evidence as to what amount, or when, or under what circumstances such payments were made.

The evidence, on the other hand, shows that, if said minors received any benefit therefrom, it was through its common use by the Ralls family mingled with the rent income and profits from the minors' property.

To summarize: In the proceedings to procure from the circuit court, sitting in equity, authority to execute said mortgage, the Gadsden National Bank was the driving force motivated by a purpose and desire to secure a lien on the property of said minors for the debt of said Ralls and wife. The bill, the answer thereto, the affidavits offered as evidence, the agreement to submit on the affidavits, the decree, and the mortgage were prepared by the bank's attorney, apparently at the same time. The cashier of the bank, enmeshed in and surrounded by embarrassing circumstances involving his own indebtedness and his professional integrity, was induced by the officials of the bank to act as the next friend (?) of the minors in filing the bill without their knowledge. The answer prepared for the signature of Mrs. Ralls, who was named as the sole defendant, admitted all the averments of the bill. She, as the evidence shows, had full knowledge of the embarrassing circumstances surrounding her husband, the father of her three younger children, when she signed the same, and the agreement to submit the case thereon. The affidavits offered as evidence; signed by the president and vice-president of the bank, went no further than to affirm that it was not advisable, at that time, to sell any of the minors' property, and the only other evidence, supporting the averments of the bill, was the admissions in said answer.

■ These circumstances, so intimately interwoven into the proceedings, are nevertheless extrinsic of the issues presented in said cause, and constitute a legitimate basis for the filing and prosecution of this bill in the nature of a bill of review. Edmondson et al. v. Jones, 204 Ala. 133, 85 So. 799.

The basic principles invoked by the appellees to sustain the decree dismissing the bill are: First, that infants are the wards of a court of equity and bound by its decrees the same as adults; and, second, that "the jurisdiction of a chancery court being that of general supervision and control of infants and their property, the court can authorize a mortgage of an infant's property and a decree to that effect is not subject to collateral attack"; third, that to justify the vacation of a decree on the ground of fraud the fraud must be extrinsic of the issues involved, and, although fraud appears, if the court would have entered the same decree if all the facts had been known, it will not be set aside.

■ The first principle stated is but a platitude or truism of the law, which means nothing more than that, when a court of equity has jurisdiction of the subject matter and its jurisdiction is invoked in respect to the property or interest of infants, the court will exercise extraordinary precautions to see that they are properly represented and that they be given a fair and impartial hearing—shall have their day in court. Lee v. Lee, 55 Ala. 590-599; Ward v. Jossen et al., 218 Ala. 530, 119 So. 220. Stated in the language of the opinion in the case first cited above: "Whenever a suit is instituted for the protection of the infant, either in person or estate, the infant becomes a ward of the court, and the court exercises over him and his estate a general supervision and control."

It does not mean that the court assumes the office of active trustee over all infants within the territorial jurisdiction, and will therefore supervise, ex mero motu, their interest and control their property and protect their personal and property rights.

The only decision touching on the second question in this jurisdiction is, Warren v. Southall, 224 Ala. 653, 141 So. 632, and in that case the estate of the infant was being administered by a guardian, and the application for authority to mortgage was made by the guardian.

No case has been cited and after diligent search we have found none that holds that such power exists, unless the estate

of the infant is being administered by a guardian or active trustee, or such course authorized by statute. A very good reason why such power and jurisdiction has not been assumed and exercised is, that, in the absence of an active trustee or guardian to conserve and protect the interest of the minor, such incumbering would be tantamount to a sale at sacrifice.

The inherent jurisdiction to order a sale of lands belonging to infants when it is shown to be to their interest, recognized for the first time in this state, in Ex parte Jewett, 16 Ala. 409, is a different matter from incumbering such property by mortgage without the existence of an active trustee or guardian. In the case of a sale the court supervises the sale and must confirm it, and, to rightfully do so, must determine that the property was sold for a price not greatly disproportionate to its real value.

In the Jewett Case, it was observed: "The only necessity for resorting to a court of equity for authority to sell grows out of the interest of the infants in the land, for it is very certain that the deed of the trustee and Mrs. Gates would be as effectual to pass her interest, without a decree, as with one authorizing the sale. We will therefore examine whether a court of equity, under the allegations and proof, ought to decree a sale as against the infants. We have no statute in this State, that has any influence on the question, and we must therefore be governed by the general rules applicable to courts of equity. It is said, that under peculiar circumstances, when it is manifestly for the interest of the infant, guardians may change the nature of their estate from personalty to realty, or from realty to personalty—2 Story's Equity, (4th edit.) § 1355; and in the Matter of Salisbury, a lunatic, 3 Johns. Ch. [N.Y.] 347, Chancellor Kent said that a change of property from personal to real, or from real to personal, may be authorized, when it is manifestly for the interest of the infant that it should be done. Yet I confess I have not been able to find a case in any of the English books, where a sale of real estate of an infant has been ordered on the ground alone that it would be for the interest of the infant, unless connected with the further reason of paying debts, or providing a maintenance for the infant. In this country, however, where the value of real estate is not fixed and stable, but vacillates as much or more than the value of personal property, it would seem but reasonable, that a court of equity should order a sale of the real estate of an infant, where it was made manifestly to appear that his interest demanded it. But then the facts which render the sale necessary should be alleged, as well as proved, that the chancellor may clearly see that the interest of the infant would not be prejudiced, but on the contrary, promoted by the sale."

We are not willing to extend the doctrine of inherent jurisdiction to incumbering the real property of infants, in the absence of a trust and the existence of an active trustee or guardian charged with the duty of administering the property and raising the incumbrance without sacrifice to the infant's estate.

Moreover, the proceeding in the case at bar is not a collateral, but a direct attack on the former decree authorizing the execution of the mortgage. Fowler v. Fowler et al., 219 Ala. 453, 122 So. 440.

When viewed in the light of the established principle that courts of equity look through form to substance, it is clearly apparent that the proceedings were inspired and prosecuted by the Gadsden National Bank and in those proceedings the minors of Midgley had no representation. 21 C.J. 204 § 119; Horticultural Development Co. v. Lark, 224 Ala. 193, 139 So. 229; Jefferson Lumber Co. et al. v. Powers et al., 223 Ala. 63, 134 So. 464.

Ralls, the pseudo next friend, was wholly disqualified, and was but the automaton of the bank, carrying into effect its purpose to obtain a lien on the minors' property to secure the debt of Ralls and wife. Swope et al. v. Swope, 173 Ala. 157, 55 So. 418, Ann.Cas.1914A, 937.

The Gadsden Loan & Banking Company, that aided and abetted in carrying out the deal, had the same officials as the bank and conducted its business in the bank, was, under the facts of this case, the mere alter ego of the bank. Jefferson County Burial Soc. et al. v. Cotton, 222 Ala. 578, 133 So. 256.

This case is clearly within the rule of Edmondson et al. v. Jones, supra, and Bolden et al. v. Sloss-Sheffield Steel & Iron Co., 215 Ala. 334, 110 So. 574, 49 A.L.R. 1206.

The decree of the circuit court dismissing the complainants' bill is therefore reversed and one here rendered granting the complainants relief, setting aside, annulling, and holding for naught the decree of the circuit court of Etowah county, in equity, of date September 29, 1931, entered by said court in the case styled "Marjorie Louise Midgley and Charles Holley Midgley, pro ami, Complainants v. Sallie B. Ralls, Respondent," and cancelling and annulling the mortgage of date September 28, 1931, executed in pursuance of said decree, by Sallie B. Ralls, H. L. Ralls, and the complainants in this case, by and through Walter M. Thompson, as register, to the Gadsden Loan & Banking Company, the foreclosure thereof, and the foreclosure deed executed mentioned in the bill. The register of the circuit court will enter upon the face of the records of said several instruments the fact of such cancellation by the decree of the Supreme Court of Alabama, and sign his name thereto.

The case is remanded to the circuit court for further proceedings, not inconsistent with the opinion.

Let appellees, the Gadsden National Bank, E. M. Elliott, as receiver of the Gadsden National Bank, Gadsden Loan & Banking Company, and J. L. Herring, as receiver of said Gadsden Loan & Banking Company, pay the costs of the appeal, in this court and the circuit court.

Reversed, rendered, and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.