28 So.2d 701

**WARNER et al. v. WARNER et al.**

**8 Div. 330.**

Supreme Court of Alabama.

April 11, 1946.

Rehearing Granted Oct. 25, 1946.

Further Rehearing Denied Jan. 16, 1947.

Geo. P. Cooper, of Huntsville, for appellants.

558

LIVINGSTON, Justice.

This suit was commenced in the Circuit Court of Madison County, Alabama, in equity, by Ronald S. Warner and Jeanne Warner, minors, by their next friend, Opal Warner, and by Louis D. Warner, Dorothy I. Warner and Stella E. Warner, as complainants, against Mary A. Warner, Eston Warner and Daisy McKnight as respondents. As originally brought, the bill claims certain interests in the lands described in the bill, in complainants as against the respondents.

To state the theory of the original bill briefly, it was averred that William A. Warner, son of the respondent Mary A. Warner, and husband of the complainant Stella E. Warner, father of Dorothy I. Warner and Louis D. Warner, and grandfather of Ronald S. Warner and Jeanne Warner, entered into an agreement with the respondent Mary A. Warner in the year 1930–1931, which agreement was without dispute shown to be entirely oral, whereby the respondent Mary A. Warner would purchase a certain lot in Huntsville, Madison County, Alabama, described in the bill, and to take title thereto in her name, and that the said William A. Warner, who died before the litigation arose, was to furnish the money to build a residence upon the lot in question, wholly at his expense, and that upon completion of the residence, the respondent Mary A. Warner would occupy two rooms of the residence, and William A. Warner and his family, who at the time of the alleged agreement consisted of himself, Stella Warner, his wife; Dorothy Warner, his daughter, Louis D. Warner, his son, and William A. Warner, Jr., another son, would occupy the remainder of the residence.

The alleged oral agreement, upon which the complainants rely according to the evidence offered, was in the process of making for more than a year before its alleged consummation by the parties. The testimony offered to establish the alleged parol agreement, if admissible, tends to show that the agreement was finally consummated about July 1931. A residence was erected on the lot, and the respondent Mary A. Warner, in whom the title to the lot rested, moved into the same about September 28, 1931; and William A. Warner, Sr., and his children, Dorothy I. Warner, Louis D. Warner, and William A. Warner, Jr., and his wife, Stella Warner, also moved into a part of the building on the same day.

After Mary A. Warner and her son and his family moved into the residence, as aforesaid, they continued to reside there until all of the children of William A. Warner moved away from Huntsville, Alabama. Nothing was said about rent, and no rent was paid; nor was anything said about the duration of occupancy.

Opal Warner, the mother of Ronald S. Warner and Jeanne Warner, is alleged to be the widow of William A. Warner, Jr. The record shows that she did not move

into the premises in litigation until after the suit arose.

By the original bill, and under the alleged agreement, complainants claim that William A. Warner at the time he died, on March 17, 1943, had a perfect equity in the lands described in the bill; an equitable lien or mortgage upon said lands. Complainants amended their original bill and claimed that the respondent appellee Mary A. Warner and William A. Warner, deceased, by virtue of the aforesaid alleged oral agreement, became joint adventurers in the purchase of said lot and the improvements on the same.

Mary A. Warner on April 15, 1943, executed a deed to the property involved in this litigation, by which, after retaining a life estate in the property in herself, she conveyed the same to respondent appellee Daisy McKnight, and at her death to the respondent appellee Eston Warner in fee simple. By the original bill, appellants claimed this conveyance constituted a fraud upon them.

The prayer of the bill was for (a) the equitable relief of specified performance of the alleged oral agreement; (b) a decree declaring in appellants a perfect equity in the dwelling on the land, with other incidental relief; (c) a decree declaring an equitable mortgage upon the lot and dwelling in appellants for the amount expended by William A. Warner, deceased, upon the dwelling, and a foreclosure of same; (d) an order enjoining the prosecution of an unlawful detainer suit commenced before the filing of the bill by appellee Mary A. Warner against Stella Warner; and (4) a decree praying that the aforesaid deed from Mary A. Warner to Daisy McKnight, et al. be set aside as fraudulent and void as against the appellants.

Under the amended bill and the prayer of the same, the appellants prayed for a decree declaring that appellee Mary A. Warner and William A. Warner, Sr., deceased, were joint adventurers of the aforesaid lot and its improvements at the time of his death, and by reason thereof that the appellants and the said Mary A.

Warner should be by the court decreed to be equitable joint owners.

Appellees separately and severally answered the original and amended bill filed in the court below by appellants, and specifically denied the alleged oral agreement set up by appellants in their bill, and demanded strict proof. Appellees also separately and severally to the original bill and the bill as finally amended filed a special plea of the statute of frauds.

The cause was submitted in the court below upon the depositions of the parties and their witnesses. When causes are thus tried in the lower court, it is the duty of this Court on appeal to sit in judgment upon the evidence. Title 13, section 17, Code of 1940; Wood v. Foster, 229 Ala. 430, 157 So. 863; Pollard v. Simpson, 240 Ala. 401, 199 So. 560; Cryar v. Cryar, 243 Ala. 318, 10 So.2d 11; Wells v. Wells, 243 Ala. 533, 10 So.2d 853.

The testimony offered by complainants tending to establish the alleged parol agreement was objected to because the agreement was void under the statute of frauds. The testimony of Stella Warner and Dorothy I. Warner was also objected to by appellees because said witnesses had a pecuniary interest in the result of the suit or proceeding, and they should not be allowed to testify against the appellees to whom their interest was opposed as to any transaction with or statement by William A. Warner, deceased, husband of Stella Warner, whose estate was interested in the result of the suit.

The trial court found the issues in favor of the respondents, and entered a decree dismissing the bill. In the decree the trial court ruled that the testimony of Stella Warner and Dorothy Warner, outlined above, was inadmissible under the provisions of section 433, Title 7, Code of 1940. Presumably, of course, the trial court did not consider the testimony of Stella Warner and Dorothy Warner in arriving at his conclusion on the facts. He also ruled that the oral contract between Mary A. Warner and William A. Warner, deceased, was prohibited by the statute of frauds, and was therefore null and void; that if William A. Warner ever had an

equitable lien on the house and lot by virtue of the payment and discharge of the $2500 mortgage thereon to the Huntsville Building and Loan Association, such lien has been discharged, liquidated and offset in full by the value of the use and occupation of the premises by William A. Warner and his family.

Stella Warner and Dorothy Warner, wife and daughter, respectively, of William A. Warner, deceased, testified that they heard the oral agreement between William A. Warner and his mother, Mary A. Warner, relative to the purchase of the lot and the building of the house on it. They related the details of the agreement, over the objections of respondents. They have a pecuniary interest in the result of the suit, and their testimony was as to statements made by a decedent whose estate was interested also. They were not called to testify to it by the parties to whom their interest is opposed. The trial court correctly ruled that they were incompetent witnesses as to the details of the transaction. Section 433, Title 7, Code of 1940; Pfingstl v. Solomon, 240 Ala. 58, 197 So. 12. Section 433, supra, prohibits the testimony although it is favorable to the interest of the estate, and the witness is called in behalf of such interest. Pfingstl v. Solomon, supra; McDonald v. Harris, 131 Ala. 359, 31 So. 548; Adler v. Pin, 80 Ala. 351; Watson v. Appleton, 183 Ala. 514, 62 So. 765; Qualls v. Monroe County Bank, 229 Ala. 315(3), 156 So. 846; Richardson v. Dean, 237 Ala. 421, 187 So. 176, notes 117 A.L.R. 609: see, also, Jennings v. Provident Life & Accident Ins. Co., 246 Ala. 689, 22 So.2d 319.

Absent the testimony of Stella Warner and Dorothy Warner, we are not reasonably satisfied that William A. Warner and Mary A. Warner made the oral agreement set out in the bill of complaint. It is therefore unnecessary that we consider the applicability of the statute of frauds in respect to such a contract, nor need we consider whether such an agreement constitutes a joint adventure. Conceding, without deciding from other evidence in the record that William A. Warner paid the $2500 mortgage to the Huntsville Building and Loan Company, we are further satisfied that the use and occupation of the premises involved was ample repayment, and that Mary A. Warner did not owe William A. Warner anything at the time he died. Williams v. Williams, 210 Ala. 372, 98 So. 200.

The rulings and finding of the trial court was in accord with what we have said, and is due to be and is affirmed.

Affirmed.

All the Justices concur, except BROWN and SIMPSON, JJ., who dissent.

BROWN, Justice (dissenting).

The rule of exclusion applied to the testimony of Stella Warner and Dorothy Warner is equally applicable to the testimony of the respondent Mary Warner, in respect to any conversation or transaction with her deceased son W. A. Warner, except that she may testify that she had no such transaction with her son. But her evidence touching the payment of the mortgage and claiming that it was done with her money is within the rule of exclusion. Her evidence excluded leaves the evidence without dispute that W. A. Warner procured the loan from the Building and Loan Association and put up collateral in addition to the mortgage on the lot, and going to show that the money so obtained by the loan was used in the construction of the house on the lot. The fact that the title to the lot was in Mary Warner necessitated, of course, the execution of the mortgage by her.

The evidence is without dispute that W. A. Warner and his family and Mary Warner went into possession of the building on the same day, W. A. Warner occupying the rooms on one side of the building and Mary Warner occupying the rooms on the other side of the building; that W. A. Warner and his family remained in possession until the day of his death and are still in possession of said tenement or rooms. The evidence is also without dispute that no rent was ever paid, no demand for rent was ever made, and the evidence clearly goes to show that, neither rent nor liability for use and occupancy was contemplated.

The parties acted jointly to establish a place of abode for themselves and W. A. Warner, acting in his lifetime, discharged the mortgage on the building by payment of the indebtedness secured thereby. His possession under the circumstances was sufficient evidence of an interest to warrant his action in discharging the lien to protect his right. And under the doctrine of equitable subrogation, the complainants claiming under him are clearly entitled to subrogation to the lien and security held by the Building and Loan Association on the property, and to have said lien foreclosed as a means of protecting their interest and recovering the money which W. A. Warner paid out in discharging said lien. Murphree v. Clisby, 168 Ala. 339, 52 So. 907, 29 L.R.A.,N.S., 933; Ætna Ins. Co. v. Hann, 196 Ala. 234, 72 So. 48; Dothan Grocery Co. v. Dowling, 204 Ala. 224, 85 So. 498. These cases are sufficient to illustrate the principle and many others could be cited.

Another well settled principle is applicable. Mary Warner, the holder of the legal title, stood by and allowed W. A. Warner to procure the money to construct the building, and allowed him to go in possession and occupy more than one-half thereof for eleven years without demands for rent, and while so in possession to discharge the lien of the mortgage with his own funds during his lifetime. Under the doctrine of equitable estoppel, she should not be allowed to plead the statute of frauds in denial of his right. Weil v. Hill, 193 Ala. 407, 69 So. 438; Alabama G. S. R. Co. v. South. & N. A. R. Co., 84 Ala. 570, 3 So. 286, 5 Am.St.Rep. 401; Franklin v. Pollard Mill Co., 88 Ala. 318, 6 So. 685.

The allegations of the bill and the prayer are sufficiently broad to cover this relief.

I, therefore, respectfully dissent from the opinion and conclusion of the majority, and hold that the decree of the circuit court should be reversed, and one here rendered subrogating Stella Warner and her children to the security and lien of said mortgage, and that the same should be foreclosed.

SIMPSON, J., concurs.

## On Rehearing.

BROWN, Justice.

Upon further consideration, after reading the evidence in general conference, and viewing only competent and legal testimony, we ascertained the pertinent facts to be as follows: The respondent Mary A. Warner and her husband T. B. Warner were not persons of great means. He was by trade a harness-maker, but a considerable time before his death retired. They lived in an apartment or room above a drug store in the Demint Building in the City of Huntsville, and he had a Confederate Pension of $40 every three months. At his death he left two insurance policies in which his wife Mrs. Mary A. Warner was the beneficiary that netted her $2500 and besides he left a small amount of cash.

Mrs. Mary A. Warner collected this money and deposited it in the bank in her name. Thereafter, with the aid and assistance of her son, both participating in the negotiations, she purchased a lot upon which a building was subsequently constructed as a residence; two rooms of which she occupied and the other rooms were occupied by the son Wm. A. Warner and his family. The lot was purchased for $1500, which Mrs. Mary A. Warner paid, and she received a deed to the lot. Following the purchase of the lot Wm. A. Warner, now deceased, the husband of the complainant Stella Warner and the father and grandfather of the other complainants, arranged with the Huntsville Building & Loan Association to borrow $2500 on an "Own Your Own Home" plan. The loan was obtained in the name of Mary A. Warner. She, having the legal title, executed a mortgage on the lot and pledged a note for $1000, executed by John Mastin to W. A. Warner, and secured by stock in two corporations. Said note and collateral was the property of W. A. Warner, and, as recited in the mortgage, was transferred to the mortgagor by Warner. The mortgage embodied a power of sale for foreclosure on the lot and the pledged securities. The money obtained through

this loan on the execution of this mortgage was paid out by the Huntsville Building & Loan Association on the direction of W. A. Warner to different persons who furnished material and labor for the construction of the house. Both the notes and mortgage and the collateral note drew interest at the rate of eight per cent.

The evidence is further without dispute that the property was insured after completion of the building in the name of Mary A. and William A. Warner, and William A. Warner procured and kept up the insurance. The evidence is also without dispute that William A. Warner paid off the $2500 mortgage a short time before his death.

Mary A. Warner testified:

"I never asked my son, W. A. Warner, Sr., to pay any money for me to the Huntsville Building & Loan Association. It was before he brought me this pass book and the mortgage and note and told me it was all paid. He told me about it, but I don't know when. It was a good while before he handed the mortgage and note to me. When he handed that book to me he didn't say anything else other than, 'It has all been paid for.' He did not at that time say I owed him anything. He did not say at that time that he was going to look to the home to stand security on a debt I owed him.

"Q. Did he ever claim to you at any time while he lived that he had any interest in the home? A. He claimed that if he had the money to pay his part that he would have his part of it, but he never got the money was the way I understood it. That was after I started the building. I didn't ask anybody to transfer John Mastin's note for $1,000.00 to me. I never say (saw) the Dixie Warehouse Company stock. I don't think I have, but I know he had stock in the Dixie Warehouse. In this note and mortgage to the Huntsville Building and Loan Association that Dixie Warehouse stock is mentioned. I had no knowledge that it was mentioned in that note and mortgage at the time I signed them. I never asked anybody to transfer and assign to me any Dixie Warehouse stock. I didn't know any Dixie Warehouse stock had been assigned to me. I never heard of there being any Erwin Manufacturing Company stock being mentioned in that note and mortgage over there. I never asked anybody to transfer and assign any Erwin Manufacturing Company stock to me. I didn't ever know until recently that it had been transferred to me or mentioned in these loan papers. I never had any of that collateral that you have asked me about in my hands or possession at any time."

Mary A. Warner further testified: "When the house was completed and I moved in, I told my son, William Warner, I wanted two rooms for myself and he could live in the balance of the house. That was all that was said about the occupancy of the house, and I got the two rooms I wanted, and his family moved into the other. The house was built in '31 and from then on until he died in '43 nothing was ever said about any arrangements about occupying the house or who owned the house or anything about it. I didn't have any arrangements with him about his getting any money out of the house. * * * What that house cost me is down in that little book, I think, someplace, what the house cost. Now that's extra on the lot. I remember when I signed the mortgage. As to how much money I had at home or in the bank at that time, I don't know how much I had. I don't know how much I have got yet. But I didn't have enough to refinish paying for the house. That is the reason that loan was made. All the money I have spent on my house and have left is money I have saved from my pension and the insurance I got from my husband and what my children paid me. Albert was the only one of my children who ever borrowed from me. And if he ever borrowed any money from me he paid it back. He didn't owe me anything when he died, not a penny."

The evidence shows that Mary A. Warner and her son W. A. Warner were very close and intimate. She kept a diary in which she entered many things and in which W. A. made entries. On one page appears an itemized statement made by Mary A. Warner in April and June, 1931, showing that

she paid for the lot and for material used in the building a total of $2800.00. On the following page entry is made as of September 28, '31, "Signed mortgage for $2500 Oct. 27, '31. Started building house on July First, finished Oct. 30, '31. Cost 6500 Hundred." On page 17, "March 14, '33. W. A. has kept me in coal & water & lights & gas & paid insurance on house. I paid tax which is $103.13, Mary A. Warner. Paid tax every year for 6 years which is 103.18 each time, Mary A. Warner."

On page 91 of the diary, dated September 11, '34, is the following entry: "Children keep my 2 rooms just as they are until all of you are gone for a home so no one can say get out. I know how 'tis to be old. No one cares if you are sick and lonesome. Some be glad to put out so they could be *it*. We can't tell what may happen.

"By, by

"Miss Mary Warner

"Your Mother to my 4 children."

On page 93, dated July 31, '38 is the following:

"Sunday A.M.

"To all concerned. Don't think Stella or Dot cares if I was gone, but will say I am at home. Hope to stay until I am 100. Ha. Ha. If I go soon don't want them come in, but move me if possible. I will come back and scare the life out. They don't seem to care. Never come in when I am sick to see if could give me a drink. If I die in night no one would know until W. A. came home next night."

On defendant's Exhibit "D" in respect to insurance is the following entry: "Address—519 Walker Street. Initials or style of firm: Warner, Mary A. and W. A." A like endorsement is found on each of the policies of insurance on the house exhibited and attached to the record.

■■ The testimony of Mary A. Warner and the exhibits thereto which we have noted above and the other exhibits offered by the respondents were not objected to by complainants, and they were interested in the issues involved, and had a right to waive the rule of exclusion when the testimony was offered by their adver-

sary. We think there can be no doubt that the sole owner of the estate left by a decedent is the only person interested in the rule, may waive it, and did waive it in the case at bar by failing to object to the competency of the witness called to testify against them by their adversary. Rogers v. Austill, et al., 213 Ala. 163, 104 So. 321; Butler v. Jones, 80 Ala. 436, 2 So. 300; Hendricks v. Kelly, 64 Ala. 388, 391. But the Act entitled "An Act to regulate the practice in equity cases in the matter of objection to and consideration of testimony and evidence," Act 101, 1943 Regular Session, p. 105, Code 1940, Tit. 7, § 372.(1), does not relieve the parties from making specific objection to the competency of witnesses, and, therefore, does not save the waiver of the statutory rule. Des Portes v. Hall et al., 238 Ala. 641, 192 So. 899; 70 C.J. p. 184, § 252, p. 372, § 490; 28 R.C.L. p. 448, § 35; 20 Am.Juris. p. 246, § 253.

■ The entries on respondents' exhibits noted above are not within the rule of exclusion. They are admissions against interest or collateral matters illustrating and giving character to the acts of the parties. 22 C.J. p. 297, § 324, Note 5 (Alabama Cases); see also 31 C.J.S., Evidence, § 272, McDonald v. Harris, 131 Ala. 359, 366, 367, 31 So. 548; Warten v. Black, 195 Ala. 93, 70 So. 758. The rule of exclusion is limited to personal dealings in which both parties participated. Southern Nat. Gas Co. v. Davidson, 225 Ala. 171, 142 So. 63; Whitfield v. Hall, 235 Ala. 620, 180 So. 293.

The complainants' rebuttal evidence shows that Stella Warner, the widow of W. A. Warner, at the time the building in controversy was being constructed, was in business for herself, operating a cafe in the City of Huntsville shown to be a profitable business; that she supported the family out of its earnings and also borrowed money from the Henderson National Bank about the time her husband bought the cotton which he sold to pay off the mortgage, and her testimony is corroborated by statements made by the bank attached as exhibits and offered in evidence showing an active checking account

and a loan of 925 by the bank. It also appears from the statement from the bank that the deceased W. A. Warner had an active account on which he drew checks in payment of monthly installments to the Huntsville Building & Loan Association on the mortgage loan, and the evidence further shows that he was regularly employed on a salary of $250 per month. The testimony of Mrs. Mary A. Warner shows that the income enjoyed by her up to one year prior to giving her testimony was her pension as a widow of a Confederate Soldier of $30 per quarter, received from the State of Alabama, and small contributions from some of her children.

The testimony of Mrs. Edna Foster and Paul Foster, her husband, shows that at the time the building in question was being constructed, they were building a house for themselves; and the testimony goes to show that they, with the family of W. A. Warner and Mrs. Mary Warner, lived in the same building on Walker Street known as the old McAnelly Place; that they and the Warners frequently talked about building operations; that they and the Warners discussed the house they were building, and their testimony tended to show that Wm. A. Warner and his mother were jointly interested in building the house in question; that Mary A. Warner was to have and occupy two rooms and W. A. Warner and his family occupy the other part of the house and he was to pay for building the house in whole or in part. The evidence shows that the total cost of the completed project was $6500; that Mary A. Warner, including the cost of the lot, paid into the project $2800. This is shown by her testimony and the diary, which she offered in evidence.

█ The conclusion is inescapable that W. A. Warner paid the mortgage debt of Mary A. Warner to the Huntsville Building and Loan Association with interest due thereon and other necessary sums of money to complete the building of the house. The purpose of the joint adventure was accomplished when the house was completed and the parties entered into possession, each, by common consent, assuming possession of the tenement he or she desired to occupy. The adventure was to build a home for the parties, and when W. A. Warner paid off and discharged the mortgage and continued his possession without question by the other party to the adventure for a period of twelve years, more time than required to establish title by adverse possession, his right in the tenement which he occupied became fixed and certain. Likewise, the possession and interest of Mary Warner, who selected and only claimed the two rooms which she occupied with the right to use the bathroom in common with the occupants of the other tenement, also became fixed. The evidence shows that her contribution to the joint adventure, including the purchase money for the lot, was $2800, and that the total investment amounted to $6500, which could only have been paid into the project by W. A. Warner, Sr., deceased. It, therefore, becomes the duty of the court in this case to declare and settle the rights of the parties. Talley v. Talley, ante, p. 84, 26 So.2d 586; Pfingstl v. Solomon, 240 Ala. 58, 197 So. 12.

█ On the facts stated, we hold that the complainants are entitled to relief; that the tenement on the west side of the house occupied by Wm. A. Warner and his family during his lifetime and which complainants have continued to occupy, in which Wm. A. Warner had a perfect equity, passed to and vested in complainant under the statutes of descent and became their property at the moment of his death, no necessity for an administration appearing. Forman v. McAnear, 219 Ala. 157, 121 So. 538. That the other tenement consisting of the two east rooms with the right to use the bathroom with the tenants of the other tenement, is the property of the respondent Mary Warner.

The legal title to one-half undivided interest in the lot upon which the building is situated, described in the bill, is divested out of the respondent Mary Warner and vested in the complainants as successors in interest of W. A. Warner, Mary A. Warner to have and hold the other one-half undivided interest in said lot.

The temporary injunction heretofore issued on the filing of the bill which was dissolved by a decree of the circuit court

is reinstated and made perpetual together with restraining order issued by this court continuing in force and effect said injunction restraining the defendants from the prosecution of any suit to dispossess the complainants.

The deed executed by Mary A. Warner to her daughter Mrs. Daisy McKnight and her son Robert Eston Warner in so far as it affects the tenement of the complainants and their title in the lot is vacated, canceled and held for naught, and the register is directed to enter upon the record of said deed in the office of the Judge of Probate of Madison County, Alabama, the fact of such cancellation stated above and sign the same in his official capacity. The register is also directed to enter upon the margin of the record of the deed from Griffiths to Mary A. Warner in the office of the Judge of Probate of Madison County, the fact that by decree of this court this day entered a one-half undivided interest to the lot involved in this litigation is divested out of said Mary A. Warner and invested in complainants and sign the same in his official capacity.

Application for rehearing is granted. The judgment of affirmance is set aside and a decree is here rendered reversing the decree of the circuit court, granting to complainants relief as above indicated. Let the appellees pay the cost of this suit and of the appeal.

Application for rehearing granted. Reversed and rendered.

FOSTER, SIMPSON, and STAKELY, JJ., concur in the opinion.

LIVINGSTON, J., concurs in the interpretation of the Act No. 101 of 1943.

GARDNER, C. J., and LIVINGSTON and LAWSON, JJ., dissent.

On Application for
Rehearing and Modification of
Decree Entered October 25, 1946.

BROWN, Justice.

■ This case has invited and received the careful, painstaking consideration of the court and has not been free from difficulties. It falls within the field of equity jurisprudence wherein the court may look through form to substance to avoid bogging down in the mire of legal intricacies and technicalities, leaving no right without remedy. Janney v. Buell, 55 Ala. 408; Elkins v. Bank of Henry, 180 Ala. 18, 60 So. 96; Smith v. Thompson, 203 Ala. 87, 82 So. 101; Horticultural Development Co. v. Lark, 224 Ala. 193, 139 So. 229; Jefferson Lumber Co. v. Powers, 223 Ala. 63, 134 So. 464; Andress. v. Parrish, 239 Ala. 67, 193 So. 727; Averett v. Averett, 243 Ala. 357, 10 So.2d 16.

The court in the instant case, keeping in view the "pole star" of *justice* and *equity* between the parties as fixed and illustrated by their words and acts, must determine the nature and extent of their respective rights and interests arising out of their joint efforts and investments, practically, if not exactly, equivalent, constituting within the law a joint adventure to build a home for their use. Talley v. Talley, ante, p. 84, 26 So.2d 586; Mitchell v. Friedlander, 246 Ala. 115, 119, 19 So.2d 394, 397.

We have fully stated the facts in the majority opinion promulgated October 25, 1946, and now venture only the further statement that the evidence shows that at the time of and during the continuance of the prosecution of the adventure Mrs. Mary Warner lived as a member of the family of Wm. A. Warner, deceased, in his home on Walker Street in the City of Huntsville.

Appellee insists that the court in determining and fixing the extent of the right, title and interest of the respective parties has given undue weight to the extent of possession of the respective parties of parts of the house, beginning with its completion and continuing through the life of Wm. A. Warner and since occupied by his wife, children and grandchild.

On further mature consideration we are now of the opinion that the effect of the decree of October 25, 1946, declaring and fixing the interests of the respective parties in the tenements which they occupy, creates an estate in severalty (McConnel v. Kibbe, 43 Ill. 12, 92 Am.Dec. 93; 7 R.C. L. 816, para. 8), and a cotenancy between

566

the parties as to the lot upon which the house is situated—a situation which complicates the title and creates an insuperable obstacle to partition or sale for division through legal proceedings. McConnel v. Kibbe, supra.

 The only essential to a cotenancy or tenancy in common is a unity of possession or right of possession of the property and a cotenancy may exist in every species of property, real, personal and mixed, corporeal or incorporeal. 7 R.C.L. 815-817, paragraphs 8-10. Though a cotenant may occupy the entire property, no liability for rent or use and occupation exists in the absence of express agreement between the parties or such hostile occupancy of the whole as is tantamount to ouster of the cotenant. 7 R.C.L. pp. 828 et seq., paragraphs 22, 23 and 24; Turner v. Johnson, 246 Ala. 114, 19 So.2d 397.

 Therefore, the fact that the occupancy of the building by Wm. A. Warner and his mother was unequal in extent is not inconsistent with the existence of a tenancy in common.

The contention of appellee that she paid more into the joint adventure than did her son is refuted by her own testimony, wherein she stated on cross-examination:

"I remember when I signed the mortgage. As to how such money I had at home or in the bank at that time, I don't know how much I had. I don't know how much I have got yet. But I· didn't have enough to refinish paying for the house. That is the reason that loan was made. All the money I have spent on my house and have left is money I have saved from my pension and the insurance I got from my husband and what my children paid me. Albert was the only one of my children who ever borrowed from me. And if he ever borrowed any money from me he paid it back. He didn't owe me anything when he died, not a penny. And I didn't owe him anything."

 We, therefore, hold and decree that the result of the joint adventure and its completion was to establish a tenancy in common between Mary A. Warner and William A. Warner in the property, the house and the lot upon which it was constructed, each owning a one-half undivided interest, and that the interest of said William A. Warner passed to the complainants through the process of devolution.

The costs of this suit and of this appeal are taxed, one-half against the complainants and the other half against the defendants.

To the extent indicated above the decree here rendered on October 25, 1946, is modified, but in all other respects is reaffirmed.

Opinion extended, decree modified and application for rehearing overruled.

FOSTER, SIMPSON, and STAKELY, JJ., concur.

GARDNER, C. J., and LIVINGSTON and LAWSON, JJ., dissent.

LIVINGSTON, Justice (dissenting).

Where the testimony is voluminous and conflicting, as here, and the trial court's conclusions are supported by legal and competent evidence, the Supreme Court may refrain from making a detailed analysis of the testimony in affirming the decree appealed from. Section 66, Title 13, Code.

The foregoing was our reason for not making a detailed analysis of the legal testimony on the submission of the cause. But inasmuch as Mr. Justice BROWN has detailed some of the legal evidence, we feel that we must do likewise in support of the conclusions reached by us.

The testimony of Mary A. Warner hereinafter set out was introduced without objection, as were the exhibits hereafter referred to. Mary A. Warner testified: "I didn't tell any of the children that I was going to buy the lot. I don't think I ever told anybody about the lot until after I had bought it. * * * I bought it through Jeff Terry. Before I gave that check, and on April 18, 1931, I had given a check for $100.00 to Terry as a binder on the lot, a part of the purchase price. That's the check there. Both the $1400.00 and the $100.00 check are on the Rison Bank * * * I made those payments and also $117.29 due the city of Huntsville for municipal improvements."

It seems to be conceded that Mary A. Warner paid for the lot and for material used in the building, a total of $2800, and that the $2500 borrowed from the Huntsville Building and Loan Association was paid out by the association for labor, materials, etc., in the construction of the house.

As stated by Mr. Justice BROWN, "The evidence shows that Mary A. Warner and her son W. A. Warner were very close and intimate. She kept a diary in which she entered many things and in which W. A. Warner made entries." Concerning entries made in this diary, Mary A. Warner further testified:

"That sheet in this challenger composition book that you offered in evidence this morning has my name at the top of it. That first entry in ink, April 19, 1931, Pd. on lot $100.00, either Albert wrote it there or I did. Nobody ever touched this book but me and Albert. This entry in ink, June 10, 1931, and a ditto under Pd. above, balance on lot $140.00 either him or me put that in that book. I might have put it on there myself in ink. I wrote that recording deed and tax $3.00. Labor $50.00—I wrote that. Street paving $122.-84, I wrote that. I paid that. The street paving ran more than I thought for when I bought the lot. After that street paving entry that I made there, all the other entries to the bottom of the page look to me like Albert's handwriting. It must be his. That total is $2800.00 When I started this building out there I had money at home in my trunk or somewhere else, and I have still got some. On page 116 there appears at the top of the page Wm. A. Warner 6–27–31 and there are items of labor and work and so on; in my judgment it looks to me like Albert's handwriting. I think I would be safe in saying it is his. I have looked on page 115 of the book, and in my judgment those entries look like his handwriting to me. On page 114, it says W. A. Warner paid by Mama; that is his handwriting. I have looked at the balance of the entries on this page over here, 114, and in my judgment my son, William A. Warner, Sr., has put that down there, and all of it I have give him

the money to pay for it. I tell you that the entries on pages 116, 115, and 114 of the Exhibit N represent cash money I paid at my home $1124.71. I had the cash at home. I spent this $2800.00 out of the bank and the two together went into the home. That is right. After I got my home completed I owed that mortgage on it. I didn't owe the mortgage before I made it. I did owe a balance when I got through. * * * That is my signature on that note dated October 27, 1931, for $250.00. I identify the note referred to, payable to the Huntsville Building and Loan Association, as the note upon which I got the money. That mortgage bearing the same date as the signature on it. That's my signature. That's what I signed to get the $2500.00. I didn't owe anybody but Dilworth that I recall. I didn't take the money I got and pay the bills; the building and loan association paid it out for me. After I made that loan over at the building and loan association, I give the money for the monthly installments to Albert, and he went and paid it. And he would come and tell me he paid so and so."

Mary A. Warner further testified:

"I did let them know I was going to build a home. I was 76 years old when I moved in there. I am 90 now. I didn't have anybody to advise me or to depend on besides W. A. Warner, Sr., and he was just as good to me as he could be. When I started talking about building the house, he tried to figure the plans out, and plan them out. Finally I had a plan for the house. He figured out the house plan. I depended on Albert to get the men to build it. I depended on him from time to time for advice about the building of it. I never had an understanding or agreement with my son Albert Warner or William A. Warner, Sr., before or after I acquired this lot on Walker Street in Huntsville, Alabama, whereby he was to put any money in that building and I was to put money in it and the property was to be mine for my life and at my death the property was to be his. W. A. Warner, Sr., never claimed to me in his lifetime that I owed him anything. He never claimed to me in his lifetime that he had any interest in that

home of mine. He never called upon me to execute a deed or any other paper that would turn that property over to him. * * * I never made any agreement of any sort with my son, William A. Warner, whereby he was to advance money and I was to buy a lot and he was to build a house on it, and then the two of us would occupy the house, me two rooms, and him and his family six rooms, and at my death the property would be his. I never made that sort of an agreement with him. I heard something about such an agreement here in the last few months. I can't say when I first heard it. I have heard so much, but I didn't pay no attention to any of it. It might have been before this suit was brought. I don't remember. My son, William A. Warner, Sr., never made any such claim before he died. I don't remember whether or not I heard it before I got sued."

On cross-examination, Mary A. Warner testified:

"Q. And he paid the balance of the mortgage off without saying anything to you about it? A. I give him the money to pay it. And he came back and told me he had sold the cotton. I had let him have the money to buy the cotton and he used it to pay the mortgage. And he said, 'I sold it and I will bring you the mortgage.' I don't know where the checks are for that cotton. I gave him cash for it, not checks. He did not pay me back that money. I gave him money for the cotton. What that house cost me is down in that little book, I think, some place, what the house cost. Now that's extra on the lot."

The diary contains entries showing payments made by Mary A. Warner on the mortgage to the Huntsville Building and Loan Association of approximately $600.

It also seems undisputed that Mary A. Warner paid all taxes on the house and lot; that the taxes were approximately $103 per year for several years, and were then reduced to approximately $95 per year.

The testimony relative to the insurance of the house is, in our opinion, inadmissible. It was shown without dispute that Mary A. Warner did not purchase the insurance, was not present when the policies were issued, and that she never authorized the issuance of them.

We are not impressed with the testimony of Fletcher Foster, nor that of his wife, Edna Foster. Fletcher Foster is the brother of Stella Warner, one of the complainants. His testimony and that of his wife consist, more or less, of general statements as to what was said between Mary A. Warner and William A. Warner, approximately fifteen years ago, and as to what these witnesses understood the agreement between the parties was.

There is much more evidence pointing to the conclusion reached on submission. W. A. Warner was a business man about sixty-five years of age. He was bound to have known the result of his failure to properly protect his interest if any he had. For fifteen years he failed to do so. But we forego further discussion of the testimony. We are clear to the conclusion that complainants have not met the burden of proof cast by the pleadings, and feel that the rehearing should be denied.

GARDNER, Chief Justice (dissenting specially).

The greater portion of the testimony in this case was a direct violation of our statute prohibiting any witness from testifying to a transaction with or statement by a deceased person whose estate is interested in the result of the suit. Title 7, § 433, Code of 1940.

In obedience to the language of the Act of the Legislature of June 8, 1943, Gen. Acts,Reg.Sess.1943, p. 105, much of the testimony discussed in the opinion of Justice LIVINGSTON, as well as in the majority opinion by Justice BROWN, should, as I view it, be disregarded. So considered I am unable, upon consideration of the unobjectionable testimony, to find sufficient basis upon which to rest a conclusion contrary to that reached by the trial court.

For the reasons thus indicated I concur in the conclusion of Justice LIVINGSTON that the decree should be affirmed, and accordingly respectfully dissent.

Mr. Justice LAWSON concurs in the foregoing view.