We do not think this suit can be maintained, but conclude the judgment of the court below ought to be affirmed.

*Affirmed.*

Adopted March 15, 1892.

---

## MUTUAL LIFE INSURANCE COMPANY OF NEW YORK v. E. M. TILLMAN.

### No. 3145.

**1. Suicidal Poisoning—Fact Case.**—See testimony held sufficient to establish intentional suicide by taking morphia. A verdict for accidental suicide is manifestly against the weight of the evidence in the case.

**2. Opinion—Expert Testimony.**—The court properly admitted, over objection, the question, "Could a man have any conception as to how much a quarter of a grain or an eighth of a grain of morphine was if he was not accustomed to handle it?" and the answer, "I don't think a layman could tell the difference between a quarter and an eighth of a grain if he was not accustomed to handling it."

**3. Res Gestæ.**—Physicians were called in a case of poisoning by morphine. The opinions expressed at the time they were engaged in examining the patient with reference to his condition were in the nature of res gestæ and admissible on a trial involving

the issue whether it was a case of accidental or intentional suicide.   The declarations were in the course of their business and while engaged in a professional duty.

4.   **Hearsay.**—It was shown that a witness had found a letter by the suicide the morning after his death.   The witness was unable to give its contents.   The letter was lost.   Witness was asked if he had told one Phillips its contents.   He did not admit it.   Phillips was called to prove contents of the letter by narrating what the first witness had said.   *Held*, the testimony of Phillips was incompetent to prove the contents of the letter.

5.   **Testimony Relevant.**—As tending to show intentional suicide it was proved that the deceased had refused to disclose from whom he got the morphine, saying that "he did not want to hurt anybody's business."   In this connection it was competent to show that it was the custom for druggists to sell morphine to any one who applied to purchase it.

6.   **Right to Open and Close.**—In absence of complaint made in the trial court the action of that court giving the plaintiff the opening and closing will not be revised on appeal.   The burden of proof of the sole issue was assumed by the defendant. The plaintiff was allowed to open and close the argument.

APPEAL from Dallas.   Tried below before Hon. CHAS. FRED. TUCKER. The opinion states the case.

*Fiset & Miller*, for appellant.—1.   The verdict of the jury was contrary to the law and the evidence, in that the defendant established by a preponderance of evidence that David Goslin did take his own life with a suicidal intent, as will clearly appear from an examination of the evidence.   Aspley v. Thomas, 17 Texas, 220; Rowe v. Collier, 25 Texas Sup., 252; Zapp v. Michaelis, 58 Texas, 270; Willis v. Lewis, 28 Texas, 191; Taylor v. Ashley, 15 Texas, 50; Murphy v. Crain, 12 Texas, 297; Redus v. Burnett, 59 Texas, 576; Railway v. Wallen, 65 Texas, 568; Railway v. Gordon, 70 Texas, 83; Davidson v. Edgar, 5 Texas, 492; Moore v. Anderson, 30 Texas, 224; 64 Texas, 460; 1 Ct. App. C. C., secs. 861, 995, 1029, 1155; 2 Ct. App. C. C., sec. 761.

2.   Where the inquiry is about a matter that may be understood by one man of sense as well as another, opinions of a witness should be rejected and the facts stated, and the jury allowed to draw their own conclusions.   McKay v. Overton, 65 Texas, 82; Shelley v. City of Austin, 74 Texas, 608; Cooper v. State, 23 Texas, 331; Haynie v. Baylor, 18 Texas, 509; 1 Whart. on Ev., sec. 113, and note 1, p. 463; 1 Thomp. on Trials, sec. 605.

Witness should have described the drug quantity of an ordinary dose and of a poisonous dose, and the jury could determine from the facts as well as the witness whether Goslin was likely to have made a mistake in the size of the dose.   Rawles v. Ins. Co., 27 N. Y., 282; Van Zandt v. Ins. Co., 55 N. Y., 169; Mulry v. Ins. Co., 5 Gray, 541; Perkins v. Ins. Co., 10 Gray, 312; Luce v. Ins. Co., 105 Mass., 297.

3.   The court erred in permitting plaintiff's question to witness, "Wasn't there some doubt between you and Dr. Leake as to what was

the matter with him?" and in permitting the answer, "It is a fact that Goslin's pulse did not manifest morphine poison at the time I first went there.   This fact was noticed by Dr. Leake, and from the fact that his pulse did indicate something else except morphine, there was some hesitancy with Dr. Leake as to what was the matter with him." Steph. Dig. Ev., art. 25, note 9; 1 Greenl. on Ev., secs. 98, 99, 124; Best on Ev., secs. 29, 30, 492–495; 1 Whart. on Ev., secs. 170–173, 175; McNair v. Ins. Co., 13 Hun, 144; Buzard v. McAnulty, 77 Texas, 438.

4.   The court erred in permitting plaintiff to show by a witness, over defendant's objection, that it was a custom for druggists to sell morphine to any one who applied to purchase same, as appears in defendant's first bill of exceptions.   1 Whart. on Ev., secs. 20, 21; 1 Best on Ev., sec. 251; Steph. Dig. of Ev., art. 2; 1 Greenl. on Ev., sec. 52; Sayles' Civ. Stats., art. 2245.

*Crawford & Crawford,* for appellee, discussed the facts, controverting the points made in brief for appellant.

TARLTON, JUDGE, *Section B.*—In March, 1890, appellee, as assignee of a life insurance policy issued by the appellant upon the life of David Goslin, brought suit against appellant in the District Court of Dallas County to recover $2500, the amount of the policy.

Among the several defenses relied upon by appellant was the plea that in the application for insurance Goslin warranted that he would not die by his own act within two years from the date of the policy, and that he did die from an overdose of morphine or other poison administered by himself with intent to take his own life.   As the case was presented to the jury, every question except that of intentional suicide was by agreement of the parties eliminated.

Appellant here insists very impressively that the judgment should be reversed, because the defendant established by a preponderance of evidence that David Goslin did take his own life with a suicidal intent. An examination of the evidence leads us irresistibly to the conclusion that the appellant is correct.   David Goslin died August 12, 1889.   The evidence excludes all reasonable doubt that he died from the effects of morphine or opium poison administered by himself.   Was the poison taken for the purpose of self-destruction, or was it taken by mistake?

Goslin was about 53 years old.   He was devotedly attached to his family, consisting of a wife and several children.   He was a bankrupt merchant, without even a home.   He had, at or about the time of his last failure, in 1884, conveyed his homestead to one Hendricks, a creditor, in payment of a debt, and with the understanding that if he paid the amount of the indebtedness at a certain time the property would be reconveyed to him.   Litigation had ensued about the property, in which he was unsuccessful.   He still sought to redeem the homestead, and as

a plan to that end he had obtained the promise of Dr. E. M. Tillman, appellee, to purchase the property from Hendricks with the deed in Tillman's name.    Goslin was much harassed in mind on the subject of his homestead.    On August 12, 1889, Tillman was in New York on his way to Europe.    On that day he received a letter from Goslin, request-ing him to do all in his power to recover his homestead.    Accordingly Tillman made arrangements with one Sawyer to buy the home for Mrs. Goslin.    On August 13, Louis Goslin, the brother of David, caused a telegram to be sent to Tillman to the effect that David was dead, and urging Tillman to secure the property for David's widow.    At Goslin's death he had $13,000 life insurance in favor of his wife.    In addition, he had insured his life in Tillman's favor for $10,500.    He was insolv-ent—the mere manager in a store.    Whence were to come the annual premiums on these policies?    After his death his wife collected $13,000 insurance money.    With a portion of this money the homestead was redeemed.

On Sunday afternoon, August 11, Goslin, complaining of nervous-ness and headache, tried to take a nap.    Children playing ball in the yard disturbed him, and he left, stating that "as he could not take a nap he would take a street car."    He had not returned at dark, and his wife became excited and uneasy.    Louis, his brother, also became solicitous about him.    Louis states, that "knowing David's habits, he thought David might have gone to the store and laid down there."    He therefore sought David at the store.    He found him there lying on a table, on which, or up-stairs, as Louis states, he was in the habit of lying every evening.    The store was closed.    There was only one en-trance—the front door—and that was locked and the key taken out of the door.    Louis thought "his brother was suffocated from heat.    It was a terribly hot day in August."    David was seemingly breathing with difficulty.

These impress us as strange surroundings for a man seeking relief from a nervous headache on a summer evening.    Louis asked David what was the matter; to which, as Louis testified, the reply was, "Noth-ing, nothing; I had a terrible headache and have taken some Hoff-man's tropfen (Hoffman's anodyne), and might have taken it too strong, stronger than usual."    David did not ask for a doctor; but Louis, re-alizing the emergency, urged Dr. Smoot "for God's sake" to go at once to his brother, who was very sick at the China Hall.

Now, without detailing the evidence, it suffices to say, that it is quite conclusive that Goslin had not taken Hoffman's anodyne.    He was then deceiving his brother and concealing his true condition.    Why? His answer, though incorrect, indicates intelligence.    He must have known that he had taken a deadly drug, and not a harmless potion, as he stated.    Yet he asks for no aid.    Again, it is shown that Goslin was a man of education and intelligence; that he never used opium, chloral,

or other narcotics for any purpose; that he was opposed to taking any kind of medicine unless given him by a regular physician, or upon a regular prescription from a drug store. And yet we find him here poisoned with a quantity of morphine or opium evidently administered by himself. Several physicians were summoned to Goslin, among them Dr. Thurston, his family physician. The latter testified: "Goslin recognized me when we aroused him. He called me by name. He requested everybody else to leave him, as he wanted to say something to me. They all went to the door. * * * I asked him how much morphine he had taken. He said it was none of my business, as he did not want to give anybody away, and did not want to hurt anybody's business, but he said he had taken so much I could not get it out of him. * * * I understood him and he understood me. He spoke coherently enough for me to understand."

This is not the conduct or language of a man anxious to live. It is not the conduct or language of a man the victim of accident or mistake. That Goslin did so speak and act is not controverted. A note in David Goslin's handwriting, placed conspicuously in the wire railing of his office, was found on the occasion in question by one Navra, an intimate friend of Goslin. Its full contents were not established, but it had upon it the word "sick." Its possession was traced to Louis Goslin. The plaintiff, though notified, failed to produce it or account for it. It was evidently written after Goslin reached the store. It appears to have reference to his condition. If able to write a note concerning his condition, why could Goslin not have summoned help? The circumstances connected with this note called for its production by the plaintiff or some explanation of its absence. Its seeming suppression makes against his case.

The death of Goslin, indisputably due to an overdose of morphine or opium self-administered, must be explained on the theory of accident or of intentional suicide. It is true that the presumption of law attaches to the former theory; but this presumption can not prevail against evidence to the contrary. We can not reasonably explain the conduct and condition of Goslin on the theory of accident or mistake.

It is incumbent on the defendant in this case to prove by a preponderance of the evidence the fact and purpose of self-destruction. We think the defendant made this necessary proof, and that it was entitled to a verdict. This court is loath to set aside the verdict of a jury. Its rule of decisions is to uphold verdicts rendered under a charge fairly presenting the law of a case. This rule, however, does not apply where, as in this case, the verdict appears to be "manifestly against the weight of the evidence." There was no such conflict in the evidence as might justify the jury in finding either way. Willis v. Lewis, 28 Texas, 191; Zapp v. Michaelis, 58 Texas, 270.

To S: D. Thurston, a physician, the following question was put by the plaintiff: "Could a man have any conception as to how much a quarter of a grain or an eighth of a grain of morphine was, if he was not accustomed to handling it?" Objection was interposed, on the ground that the question elicited incompetent evidence and an opinion, when the jury could form their own opinion from the facts.

We are called upon to review the action of the court in overruling the objection. The effect of morphine necessarily depends upon the quantity taken. If a person, therefore, should be unable to distinguish quantity, it would be probable that he would take an overdose of morphine with a view solely to relieve him from pain, and without contemplating any fatal effect. It had been shown that Goslin was not accustomed to the use of the drug. The question then addressed itself to the effect of the medicine as it might have been understood by Goslin. This was a matter of pertinent inquiry. It called also for an expert in drugs, because a person inexperienced in the use of morphine can not be supposed to know whether or to what extent a harmless could be distinguished from a hurtful quantity. Information on such a subject is peculiarly within the knowledge of an expert. It involves an acquaintance with the characteristics, strength, and intensity of the medicine. We sustain the court.

Dr. W. B. Smoot and Dr. Leake were called as physicians to see Goslin. The former had testified, as a witness for defendant, that he examined Goslin, and concluded from symptoms, which he described, that the case was one of morphine poison. Dr. Leake was present in his professional capacity with Dr. Smoot. Under these circumstances plaintiff's counsel asked the witness Smoot, "Wasn't there some doubt between you and Dr. Leake as to what was the matter with him?" To which the witness answered: "It is a fact that Goslin's pulse did not manifest morphine poison at the time I first went there. This fact was noticed by Dr. Leake, and from the fact that his pulse did indicate something else except morphine, there was some hesitancy with Dr. Leake as to what was the matter with him." This evidence was objected to as hearsay. The witness testified, that he did not think Dr. Leake made a diagnosis of the case. It is, however, apparent from his statement that himself and Dr. Leake were engaged in a professional inquiry as to what was the matter with Goslin, an inquiry pertinent to the issue here involved. The opinions expressed at the time with reference to the subject of consideration by the one or the other in the course of their examination were, in our opinion, in the nature of res gestæ, and so admissible. The declarations were made in the course of their business and while engaged in a professional duty. They were coincident business declarations. 1 Whart. on Ev., sec. 262.

One Leon Navra testified as a witness for defendant. He stated that he went to Goslin's store on the occasion in question, and that he there found a paper in the handwriting of Goslin; that he did not remember the contents of the paper. Having previously without effect interrogated Goslin as to whether or not he had stated its contents to one M. E. Phillips, defendant sought to prove by the latter that Navra had stated to him out of court the contents of the paper. To this plaintiff objected, because such evidence would be incompetent to prove the contents of the document. The ruling of the court was certainly correct. If the absence of a written instrument be properly accounted for, its contents may be proved by the testimony of one who knows them, but it is elementary that a fact can not be established by the statements of a third party to a witness.

Appellant complains that the plaintiff was permitted to open and conclude the argument, though appellant was entitled to do so. It does not appear that appellant suggested to the court its right to open and conclude, if in fact it existed; nor did it take an exception to the fact that the plaintiff began and ended the argument. In the absence of a complaint in this regard on the trial, we will not heed it here.

Over objection of appellant, it was proved by Dr. Thurston that it was the custom for druggists to sell morphine to any one who applied to purchase it. It is contended that this evidence was irrelevant and immaterial.

Testimony very much relied upon by appellant to support its theory of intentional suicide consisted in the evidence of Dr. Thurston, that Goslin refused to state to him from whom he got the morphine, saying that "he did not want to hurt anybody's business." Whether or not Goslin understood what he was saying was a question of fact for the jury. The evidence complained of tended to show that he could get morphine from any druggist without exciting suspicion or jeopardizing in any degree the dealer's business. It tended, therefore, also to show that Goslin did not understand the character of the statement made. It was hence material.

The judgment should, on account of the error pointed out, be reversed and the cause remanded.

*Reversed and remanded.*

Adopted March 15, 1892.