## LAPHAM v. UNITED STATES et al.

United States District Court
S. D. New York.
Oct. 17, 1950.

Harry Eisenberg and Robert Klonsky and Jacob Rassner, all of New York City, for libelant.

Irving H. Saypol, United States Attorney, New York City, Gay & Behrens, New York City (Edward J. Behrens, New York City, of counsel), for respondent United States of America.

Gay & Behrens and Edward J. Behrens, all of New York City, for respondent Waterman Steamship Corp.

McGOHEY, District Judge.

Libelant, a seaman, sues for damages on account of personal injuries. The libel against Waterman Steamship Corporation was on libelant's motion dismissed with prejudice. The trial then proceeded against the United States alone. Both sides rested at the close of libelant's case.

The libelant claims to have been injured on April 26, 1944, by being thrown from his bunk to the deck, when the S.S. Pan Crescent went aground at the entrance to South Pass, Louisiana, at the mouth of the Mississippi River. The vessel, a cargo ship, was then owned, managed, operated and controlled by the United States, and libelant was on board as a messman in the employ of the United States. Captain Carl W. Moline was in command. He holds a Master's unlimited license for all oceans since 1933. He had gone through South Pass forty or fifty times. He had commanded the Pan Crescent on five voyages during the six months prior to the grounding. His deposition was put in evidence.

During the voyage, which began on March 25, 1944 at New Orleans and ended on the date involved here, there had been no difficulty with the vessel's steering apparatus, engines or communications between the bridge and engine room. The ship's officers had executed all instructions properly and promptly. The vessel was in all respects properly manned and equipped, and seaworthy.

She arrived at the Sea Buoy off South Pass, Louisiana, at about 1:00 A.M. April 26, 1944, fully laden and bound for New Orleans. There, as required by Louisiana law, she took on a "bar pilot" to pilot the ship into and through South Pass to Pilot Town, which is about sixteen miles up the Pass. The pilot, Walter E. Durabb, was qualified by training, experience and license. He had an apprenticeship of seven and one-half years on the passes of the Mississippi River before being duly commissioned as a pilot by the State of Louisiana in January, 1942, and by the United States Coast Guard in May, 1943. His deposition was put in evidence. On coming aboard, and after being informed as to vessel's draft, speed and how she was handling, the pilot took and thereafter exercised exclusive control of the vessel. The master testified that he did not believe it necessary at any time to countermand any of the pilot's orders or to issue different orders.

Before leaving the Sea Buoy, the master stationed his chief officer, boatswain and some crew members at the forepeak to stand by to let go the starboard anchor if ordered. He had the second mate with him on the bridge with the pilot and a lookout. At the wheel, he stationed a man he considered the best wheelman in the crew. This man was off watch at the time and was paid overtime for the extra duty.

Regulations of the War Department permit only vessels having a speed of at least nine knots to enter South Pass from the Gulf when the Mississippi River is at flood stage, as it was at the time here involved. The vessel was making her maximum speed of fourteen knots when she entered the Pass against a current of six or seven knots running out of the Pass.

From the Sea Buoy the course traveled was 298 degrees true, which was proper and customary. After holding this for approximately two miles it is necessary to swing to a course 326 degrees true to bring a vessel fair into the Pass. The Pan Crescent, while attempting to swing to this course, failed to make the turn and ran aground in the mud on the west side of the Pass, where she listed to starboard twenty-five or twenty-six degrees. The master thereupon took the necessary precautions for the safety of the officers, crew and vessel. He had a general alarm sounded and called the nearby Coast Guard station for assistance. Within about an hour thereafter most of the crew, including the libelant, were taken ashore by a Coast Guard tug which made two trips from ship to shore. The libelant remained on board for more than an hour after the grounding, leaving on the tug's second trip. He made no report of injury or illness although he talked to the mate during that time. The log contains no entry of his claimed injury. It does, however, contain an entry of injury to the second officer Thomas, whose knee was hurt while he was helping to lower a lifeboat, after all but the master and a skeleton crew were ashore. Both the master and the pilot, who watched the crew, including the libelant, disembark, observed no apparent injury to any of them.

The crew were taken to an Army station on shore, where they remained for some hours before being brought by bus to New Orleans. There the libelant received a note from the ship's purser requesting the Marine Hospital to "take care of this man." The libelant drew ten dollars of his wages and went off at about six or seven o'clock in the morning of April 26. He appeared at the hospital about eighteen hours later, at about half past one the following morning, April 27. He there said he had been hurt on the Pan Crescent, and complained of "pain in his back, right forearm and left frontal region." A physical examination found only "Spine, tenderness in lumbar region. Slight ecchymosis." During the afternoon of April 27 he requested and received permission to leave the hospital. He

was gone for a short period during which he went to the office of the Commissioner and signed off the vessel. He returned to the hospital and spent the night of the twenty-seventh there. He was discharged as fit for duty on the following day, April 28, and returned to his home.

The foregoing is in large part conceded in libelant's brief. What is not, is clearly established by uncontradicted evidence.

The charge of negligence is based on the testimony of Captain Ash, called as an expert by libelant. He testified that in his opinion the ship was improperly navigated in two respects, first, one-third of its speed should have been held in reserve; second, the orders "right" and "hard right" were not given in time to bring the ship head on into the current. These two factors he said caused the ship to be driven aground.

■ Durabb, the pilot, said that he was acting in accordance with the usual custom of pilots coming into the pass, and that the grounding was caused by a boil in the water which hit the starboard bow so that the vessel could not respond to the rudder. Ash denied that there was a boil at that point. But he was admittedly not present at the time in question. His discourse on the contour of the bed of the pass and its relation to boils is not persuasive. There is no testimony that he has any expert knowledge of or experience in such matters at all. I accept the pilot's testimony on this point. I also accept his testimony as to the point where he gave the orders "right"—"hard right." He said that he determined this point by using two range lights on the west bank of the pass. One, called the "front" light, is located near the entrance, and the other, known as the "rear" light, is some distance up the pass. Ash conceded that these were appropriate aids when the river was normal but not when it is at flood stage, as it was on the night we are concerned with. There is, however, nothing to support this view in any of the official guides put in evidence. Ash offered no more authority than his own pronouncement, which is in my opinion not to be accepted to contradict the experienced and qualified men who served as pilot and master of the vessel. Ash's ex-

perience on this pass is not to be compared with theirs. He has no pilot's license nor any pilot endorsements on such licenses as he holds.

■ As to what speed was appropriate, Ash's testimony, it seems to me, falls of its own weight. He said the vessel should have been running at not more than two-thirds speed as it came up to the point of turning, so as to have some reserve available to drive against the flood current. The vessel had a speed of fourteen knots. Ash then would have had it running at nine and one-third knots, just one-third knot over the minimum speed permitted by the regulations. At the point of turn, the increase to fourteen knots he said would have driven the vessel through. This, however, ignores what actually happened. The established fact is that fourteen knots was not enough to drive the vessel through the current at that time.

The pilot had dropped the starboard anchor to "trip her around," after the vessel failed to respond to the rudder. Ash conceded that this was good procedure. He said, however, it was improperly done in this instance but did not point out what was improper about it. There is no testimony whatever that the anchor winch or any of the anchor gear was defective. When the vessel was drawn off the bank the winch picked up the anchor without difficulty. There is no evidence that the winch was repaired in the meantime.

On all the evidence, I find that the grounding was not due to any negligence of the respondent or its agents, servants or employees. Accordingly, if the libelant received any injuries on the vessel they were not the result of the negligence of the respondent.

There remain two questions. Was libelant injured while in the employ of the vessel? and, if so, to what extent is he entitled to maintenance and cure?

The uncontradicted evidence shows that he did not sign off the vessel until the afternoon of April 27, 1944. Thus he was still in the employ of the United States when, at about one-thirty in the morning of April 27, 1944, he appeared at the hos-

pital in New Orelans. There he complained of "pains in his back, right forearm and left frontal region." A physical examination, however, showed only "Spine-tenderness in lumbar region, with slight ecchymosis;" presumably in that region. Because of statements which appear in subsequent reports of other hospitals and other doctors, it is necessary to point out that the New Orleans report contains no mention of a cut behind his right ear. Neither does it contain any statement that he was thrown from his bunk. Indeed, there is no record attributing the latter statement to the libelant until July, 1945, fifteen months after the accident, and about a month after he had served his notice of intention to sue the United States. According to the hospital records, prior to that time he claimed only that he had fallen while on the vessel.

■ According to the hospital records and the doctors' reports since July, 1945, libelant is suffering from "nervousness;" and has an "unstable personality." This indeed was apparent at the trial. Moreover, his recollection was almost totally blank about important details. He was unable, for instance, to recall what he had told the doctors at New Orleans, even after reading their report. On the stand, he said his complaint to the doctors at New Orleans was not what appears in their report at all, but the following: "* * * when I walked, that it bothered my right leg, pains in my legs, and told them I couldn't walk right. I couldn't walk normally. That is what it was. I told them I got hurt on the Pan Crescent." The New Orleans record contains no mention of his legs or difficulty in walking. On the stand, he could not recollect how he spent the eighteen hours between the time when he departed from the rest of the crew in New Orleans at six or seven o'clock in the morning of April 26 and one-thirty in the morning of April 27, when he reported to the hospital. He had no recollection of drawing ten dollars against his wages as shown in the log. He recalled, however, and admitted, that while a patient in the New Orleans hospital on April 27 he got permission to go to town where he went to the Commissioner's office and signed off the Pan Crescent. He returned to the hospital, spent the night of April 27 there, and the following day he said he felt fine and was discharged as fit for duty. I do not suggest that he is consciously falsifying, but the sum total of his testimony and his prior statements is so confusing, and in part contradictory, that it does not and cannot support his claim of having been thrown from his bunk. The only findings that can be made are that he was injured in some degree while in the employ of the United States but in some manner not attributable to his employer's negligence.

■ The claimed extent of that injury was likewise not proved. The conclusions of the doctors who examined him in 1945 and later are not persuasive. They are based on a "history" received from the libelant himself, which is not in accord with any independently established facts or legitimate inferences from such facts. This "history" includes "being torpedoed at sea"—being "on a ship which was struck by a mine"—"concussion of the brain"— "visible scar behind the right ear." The vessel was not torpedoed. It was not struck by a mine. The libelant had no cut behind the ear nor was he found to have sustained concussion of the brain when examined at New Orleans. Concussion of the brain appears to be based on libelant's statements, made long after the event, that he was thrown from his bunk and rendered unconscious; that he bled from the nose and mouth; and the presence of a scar behind his ear. The New Orelans hospital record contains no mention of unconsciousness or bleeding, and no cut was found behind his ear. He has a congenital incomplete sacrilization of the fifth lumbar vertebra. This may have been aggravated to some extent by the injury which produced the "Spine-tenderness in the lumbar region with slight ecchymosis" disclosed by the physical examination made in New Orleans about twenty-four hours after the grounding. Whether it was in fact aggravated and, if so, to what extent, were certainly not proved.

Libelant was discharged from the hospital at New Orleans on April 28, 1944, as cured and fit for duty. He went home to Florida. He intended to ship out but "got worked up" and remained ashore. On August 1, 1944, however, he did ship out, after passing a physical examination. Thereafter he shipped out several times after passing separate physical examinations. His last ship was the Petrofuel where, from September 6 to November 10, 1944, he served in the steward's department and the engine room. While on the Petrofuel libelant "was kind of worked up a little" and "wasn't contented." Thereafter he worked ashore at various odd jobs of the same type as he had had before ever going to sea. He is now employed as a kind of orderly at a Veterans' Hospital in Florida.

It seems to me that, giving the libelant the benefit of every reasonable doubt, maintenance and cure from April 28, 1944, up to August 1, 1944, when he shipped out on the Vicat, is the most the evidence could support.

The decree, therefore, will provide for the payment of maintenance and cure at the rate of five dollars per day from April 28, 1944, up to but not including the date on which he signed on the Vicat, which is about August 1, 1944.

Submit decree, findings of fact and conclusions of law in accord with this decision.