82 So.2d 606

### W. M. PRINCE et al.
### v.
### Henry C. LOWE.

5 Div. 601.

Supreme Court of Alabama.

Feb. 24, 1955.

Rehearing Granted June 23, 1955.

Further Rehearing Denied Oct. 13, 1955.

J. A. Walker, Jacob Walker, Jr., Walker & Walker, Opelika, for appellants.

411

L. J. Tyner, Opelika, for appellee.

MERRILL, Justice.

This is an appeal by the defendants in a damage suit from a judgment in favor of the plaintiff, Henry C. Lowe. The suit arose out of a collision of Lowe's automobile with defendants' truck and as a result of the collision Lowe received a broken back.

Assignments of error 4 to 16, inclusive, deal with objections to questions propounded by plaintiff to two doctors or with motions to exclude the answers after they were permitted. The chief objection assigned to the questions was that they called for hearsay testimony, although many other grounds of objection were stated.

Dr. Samford is a specialist in the field of X-ray and Dr. Owsley was Mr. Lowe's attending physician. Dr. Samford, Dr. Owsley and Dr. Jack Hughston held conferences dealing with the injuries to Mr. Lowe's back. Plaintiff showed more than once that Dr. Jack Hughston was "the bone specialist" from Columbus, Georgia. Dr. Hughston was not present at the trial. Dr. Samford and Dr. Owsley each testified as to their individual diagnosis and prognosis of the case but, following that testimony, each was asked on direct examination what Dr. Hughston said in the conferences and whether the opinion or conclusion of the witness was concurred in by the other doctors. We quote these questions and answers from the record omitting the objections, the rulings of the court,

the motions to exclude, the exceptions and a few nonpertinent remarks.

### Testimony of Dr. Samford:

"Q. Now, will you tell the court and the jury what Dr. Hughston said in those conferences with respect to the diagnosis of Mr. Lowe's injuries and also with reference to the prognosis, the permanency of his injuries? A. As to the diagnosis we all agreed and I have given the diagnosis before.

"A. The other part of the question I believe was the prognosis. That was the conclusion of the diagnosis part of it. As I understood there were two parts. As to the prognosis he, Dr. Jack Hughston, thought that there would always be a weakness of that region, so that extreme or more than usual bending and heavy weight lifting would be a part of his activities that should probably, would probably be impossible."

"Q. And that opinion, as expressed to you by Dr. Hughston in these conferences held by you, Dr. Hughston and Dr. Owsley, was that the joint opinion of all three doctors? A. That was our opinion.

"Q. The opinion of all three doctors? A. Yes, sir.

"Q. As expressed at the conference? A. Yes, sir.

"Q. Dr. Samford, in that conference you had with the other doctors with respect to Mr. Lowe's injuries he received in this accident, did Dr. Hughston state that it might be necessary to have another operation performed on Mr. Lowe's back? A. He did.

"Q. Now, Dr. Samford, will you explain to the jury and the court in greater detail as to what was said about the necessity, the possible necessity, of an operation? A. He said that there may have to be an operation performed to anchor those—to

stiffen those joints to keep them from moving.

"Q. Now, Dr. Samford, the opinion that you have expressed, as having been expressed by Dr. Hughston in these joint conferences on the condition, diagnosis and prognosis of Mr. Henry Lowe, do you concur in his opinion as so expressed? A. I do."

### Testimony of Dr. Owsley:

"Q. Was your conclusion or your opinion or your judgment as to the permanence of his injuries concurred in by the other doctors in those conferences? A. Dr. Hughston, at the time of the operation, I mean at the setting of his back, was not able to get this bone back into direct alinement with the rest of his back. The reason he did not do it was because he was afraid to. It was already pressing on the spinal cord, and he was, not having it open where he could see it, he was afraid to put too much pressure. If you don't know how you set these backs, you hang a man up by his neck his, actually his legs, and it swings down between to a point to which it is attached and press on the back, and you get a tremendous amount of pressure there, and he was afraid to put too much pressure because he was afraid it would result in permanent paralysis due to moving that bone too much, so that's the reason it was left a little bit out of line, and he said at the time—

"A. He said at the time that Mr. Lowe would always have an unstable back, which means a weak back, because his ligaments were torn and because of inability to put this thing in the exact alinement that he would like to have.

"Q. Dr. Owsley, the statements you have just made to the court and the jury as being the statements of Dr. Jack Hughston were made by him in conference between you and Dr. Samford in conferences dealing par-

ticularly with the injuries of Mr. Henry Lowe, were they not? A. Correct.

"Q. And then you concurred in these statements of Dr. Hughston? A. Yes, Dr. Samford was present at this operation, and Dr. Hughston and I."

The court announced that the record would show that the evidence was admitted on the authority of three cases: Grammer v. State, 239 Ala. 633, 196 So. 268; Franklin Life Ins. Co. v. Brantley, 231 Ala. 554, 165 So. 834 and Taylor v. Atlantic Coast Line R. Co., 232 Ala. 378, 168 So. 181.

The exact question before us has not been decided many times. In 1886 in the case of Village of Ponca v. Crawford, 18 Neb. 551, 26 N.W. 365, 367, a doctor was on the stand and testified in part as follows:

"'Q. State, if you can, what caused that, or what it is (an enlargement of the breast). A. I don't exactly know what it is. I have been puzzled in my own mind in regard to it; so much so that I laid the case before Drs. Frazer, Biggs, and Clinger, of Sioux City, and they were not fully decided in their own minds as to what it was.

"Q. Were you present at the time of this alleged examination by those doctors? A. I was; yes, sir.

"Q. Did you take part in it? A. Yes, sir. * * *

"Q. State what you found as the result of that examination. A. They didn't decide fully what it was.

"Q. State more fully whether you took part in the examination, and in the forming of the opinion that resulted. A. Well, if you will allow me to explain, I took him into Dr. Frazer's office first, and told him there was a matter which I wanted his opinion about; and if he thought best, I wanted other opinions in regard to it. He said he would like to have Dr. Biggs see that also; so we had Dr. Biggs come in, and then we had Dr. Clinger come

in, and they all examined that with him. All of us had hands in that examination, and each expressed his opinion of it after it was done. The result of that examination was that we decided that it was the result of an injury.

"Q. State your conclusion as to the result of that joint examination. A. I think we all decided that it was a tumor resulting from an injury.'"

The court then said:

"The admission of this testimony, so far as it applies to the expressions of opinion by the other physicians, was clearly incompetent and prejudicial. The examination was *ex parte* produced by defendant in error, and his son, without the knowledge of the plaintiff in error, its agents or attorneys. None of the physicians engaged in it were under oath, and no opportunity given the defendant to cross-examine them as to the basis of their conclusions. The testimony was upon an essential part of the case, and was simply hearsay. We know of no rule by which the testimony or opinions of expert witnesses may be produced in evidence, save by the usual methods of taking their testimony where the opinion rests upon the facts of the case on trial. If those doctors had opinions as to the cause of this enlargement, of which defendant in error desired the benefit, he should have placed them upon the witness stand in order that plaintiff in error might cross-examine them."

The next case we find is that of Hussey v. State, 87 Ala. 121, 6 So. 420, 425, decided in 1888, where the court said:

"The testimony of Dr. Dement to the effect that other physicians concurred with him in his opinion as to the nature of the wound of the deceased was clearly hearsay, and not admissible. There is no more reason for permitting the unsworn assertions of experts to be detailed second-handed in court than the like testimony of other persons. Each is equally hearsay,

within the strictest meaning of the term."

In 1937 the Court of Appeals of Tennessee, upholding the lower court in excluding testimony of one doctor who related the opinion of another doctor, said in Tevis v. Proctor & Gamble Distributing Co., 21 Tenn.App. 494, 113 S.W.2d 64, 70:

"But the testimony offered violates the rule prohibiting hearsay evidence from being introduced, and also the rule requiring the best evidence to be produced. The witness sought to testify to statements of Dr. Spurling, thus violating the rule against hearsay evidence, and he also sought to testify as to the contents of a written report made by Dr. Spurling, thus violating the rule requiring the production of the best evidence."

In the case of Bluebird Baking Co. v. McCarthy, Ohio App., 1935, 36 N.E.2d 801, 805, the court in holding that the lower court erred in permitting the witness, a local surgeon, to quote "a reputably recognized brain specialist", cited with approval the following statement: " * * * 'the testimony of a physician that other physicians concurred with him in his opinion is hearsay.' "

In Jones on Evidence, Civil Cases, 4th Ed. Vol. 1, p. 297, it is said: "By hearsay is meant that kind of evidence which derives its value, not solely from the credit to be attached to the witness himself, but also in part because of the veracity and competency of some other person from whom the witness may have received the information."

In Wigmore on Evidence, 3rd Ed. Vol. 5, § 1362, we find: "It is sufficient to note that the Hearsay rule, as accepted in our law, signifies a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of cross-examination."

Wharton, Criminal Evidence, 11th Ed. § 427, says: "Hearsay evidence may be defined as that kind of evidence which does not derive its value solely from the credit to be given to the witness himself, but rests, also, in part, on the veracity and competency of some other person."

It would appear that the quoted testimony of Drs. Samford and Owsley was hearsay under the general rule and the rule in Alabama, unless within an exception recognized in the cases cited by the court below. The case of Franklin Life Ins. Co. v. Brantley, supra [231 Ala. 554, 165 So. 837], on the question before us says:

"The admission in evidence, over objection and exception, of the fact that, on examination of plaintiff by physicians, the latter made statements to him and gave advice on which he acted, was without reversible error. These statements were a part of the res gestae of the examination that caused him to retire from business, make his claim against the defendant for disability, for which this suit was brought, as well as claims against several other insurance companies, and which claims, or due proof thereof, are in evidence. * * * "

This statement is a relaxation of the general rule that a patient may not testify what his doctor told him in reference to his injuries. Blackman v. Johnson, 35 Ala. 252 [2]; Alabama G. S. R. Co. v. Arnold, 80 Ala. 600, 2 So. 337; Taylor v. Atlantic Coast Line R. Co., supra, and Hornaday v. First Nat. Bank of Birmingham, 259 Ala. 26, 65 So.2d 678 [7]. But the case is not authority for the proposition that one doctor may testify what another doctor thought or said, unless the citations of and comment on the Texas case is such authority. We consider this Texas case later. The only other authority cited by the court in the Brantley case is 29 C.J. p. 284 and Rocci v. Massachusetts Accident Co., 226 Mass. 545, 116 N.E. 477. The text in Corpus Juris is:

"In an action for benefits for sickness confining insured to his house, testimony of physicians that insured's condition required him to be removed to another house, and testimony of the insured that he was ordered by his physician to move, is admissible to show an exigency for removal."

The Rocci case is cited in Note 6, 29 C.J. p. 284, and is authority for the text, but it should be borne in mind that the physician himself testified that he advised the patient to make the move. Thus the patient's statement was merely cumulative and if there was error in permitting him to testify that his doctor ordered him to move, it would not be reversible error because the doctor also testified to the same thing.

In Taylor v. Atlantic Coast Line R. Co., supra [232 Ala. 378, 168 So. 183], this court held that where plaintiff had testified that Dr. Edge had made an X-ray picture of his knee, the lower court properly sustained an objection to this question: " 'What did the doctor tell you in reference to the condition of your knee?' " because "the unsworn opinion of a physician, like any other expert, is mere hearsay. The proper method of proving the result of Dr. Edge's examination was to examine him as a witness." The court refers to the holding in the Brantley case, supra, notes the text in Corpus Juris and the Rocci case, supra, and says:

"We would not extend the rule to include the unsworn opinion of a physician touching the extent of injury from accident, in the absence of circumstances rendering such opinion a matter proper to be considered as part of the case. This would open wide the door to hearsay evidence."

We now come to consider the case of Grammer v. State, supra [239 Ala. 633, 196 So. 273], where the court, in discussing the fact that Dr. Kay, an expert on mental disease connected with Bryce Hospital, had been permitted to testify, without objection, that " 'it was the unanimous opinion of the medical staff that Mr. Grammer was not insane" at all conferences that discussed the matter, and that "it was my feeling and the feeling of the rest of the medical staff that" etc., said on rehearing:

"Aside from the fact that no objection was made to it, it appears that those conclusions were expressed in their conferences and examinations of defendant, where, in many of them, he was personally brought to make a diagnosis, and in others they were considering and discussing his symptoms. When so, the opinions expressed by the physicians have been held by this Court, in line with others, to be a part of the res gestae of their diagnosis and that of the physician testifying, since they were thus engaged in their professional service, and the expression of such opinions 'were coincident business declarations,' and admissible in evidence though given in the testimony of another witness. Franklin Life Ins. Co. v. Brantley, 231 Ala. 554, 165 So. 834; Taylor v. Atlantic Coast Line R. Co., 232 Ala. 378, 168 So. 181; Mutual Life Ins. Co. [of New York] v. Tillman, 84 Tex. 31, 36, 19 S.W. 294, 297. The fact that the witness expressed the 'unanimous opinion of the medical staff', rather than a repetition of what they said in that connection is not sufficient, in the absence of objection on that ground, to impeach such testimony of Dr. Kay as not being of much probative value. Whether he should have been required to repeat what each doctor said in substance, or to give it as Dr. Kay did, was a matter which defendant and his counsel could control by making objection or not as they should elect. They made no such objection, and therefore, it is not the province of this Court to minimize the effect of it as given by the witness."

The authorities cited are the Brantley case, supra; the Taylor case, supra, and the Texas case, which was also cited in the Brantley case. We have already discussed the first named cases and we quote the pertinent part of the decision in the Tillman (Texas) case [84 Tex. 31, 19 S.W. 295]. The background of that case was that the action was on an insurance policy and the insured, Goslin, was found in his locked store in a dying condition "from the effects of morphine or opium poison administered by himself", either by mistake or to commit suicide. The court said:

"Dr. W. B. Smoot and Dr. Leake were called as physicians to see Goslin. The former had testified as a witness

for defendant that he examined Goslin, and concluded from symptoms which he described that the case was one of morphine poison. Dr. Leake was present in his professional capacity with Dr. Smoot. Under these circumstances, plaintiff's counsel asked the witness Smoot, 'Wasn't there some doubt between you and Dr. Leake as to what was the matter with him?' To which the witness answered: 'It is a fact that Goslin's pulse did not manifest morphine poison at the time I first went there. This fact was noticed by Dr. Leake, and, from the fact that his pulse did indicate something else except morphine, there was some hesitancy with Dr. Leake as to what was the matter with him.' This evidence was objected to as hearsay. The witness testified that he did not think Dr. Leake made a diagnosis of the case. It is, however, apparent from his statement that himself and Dr. Leake were engaged in a professional inquiry as to what was the matter with Goslin,—an inquiry pertinent to the issue here involved. The opinions expressed at the time with reference to the subject of consideration by the one or the other, in the course of their examination, were, in our opinion, in the nature of *res gestae*, and so admissible. The declarations were made in the course of their business, and while engaged in a professional duty. They were coincident business declarations. 1 Whart.Ev. § 262."

It will be noted that the question was asked on cross examination and not direct, and was a legitimate question with the apparent aim of impeaching or modifying the direct testimony of Dr. Smoot. It was a question which could have been and, under our rules, should have been answered "yes" or "no". But the answer was not responsive to the question and the defendant went into a detailed explanation of the difference of opinion between him and Dr. Leake. We do not think the Tillman case is helpful in deciding the question before us.

In 32 C.J.S., Evidence, § 570, we find: "It has been said that corroboration cannot be had by reciting the judgment of others on the subject," citing Indiana Natural & Illuminating Gas Co. v. Anthony, 26 Ind. App. 307, 58 N.E. 868. That case holds that an expert may be asked his opinion on a matter, but it would not be competent for him to say what opinion other experts might have on the subject.

It is our opinion that the lower court should have sustained the objections to the questions to Dr. Samford and Dr. Owsley which are quoted herein on the grounds that they called for hearsay evidence and they represented an attempt to bolster their testimony with that of a third party not under oath or subject to cross examination. Too, this third party expert was the only recognized specialist in the particular field and as between experts with different experience and qualifications, the testimony of the one with the greatest experience and the more specialized knowledge of the question involved is entitled to the greater weight. 32 C.J.S., Evidence, § 572, p. 420, Note 77; Linn v. Terrell Compress & Warehouse Co., La.App., 142 So. 193; Benedict v. United States, D.C., 270 F. 267; Lapham v. United States, D.C., 93 F.Supp. 276.

The appellee knew that Dr. Hughston lived in Columbus, Georgia, and could not be compelled to come to this state to testify. Adequate provision to meet such circumstances is provided in Code of 1940, Title 7, Article 6, §§ 457–474, which provide for procuring testimony by deposition. The proper method to put the testimony of Dr. Hughston before the jury was either to have him testify in person or by deposition.

We reaffirm the rule laid down in Hussey v. State, supra, and since that conflicts with the quoted portion of the opinion in Grammer v. State, supra, the former must prevail.

It is never easy to reverse a judgment where it is obvious that both the trial attorney and the trial court followed to the letter the latest pronouncement of this court, and a check of the questions against the quoted portion of the Grammer case shows that to have been done here. But it is our duty to correct a statement in our de-

cisions which, in our considered opinion, improperly states the law. Insofar as our study reveals, the quoted part of the Grammer case has not been followed by this court since it was announced and this case presents the first opportunity of this court to reconsider the matter.

In view of the fact that the case must again be tried, we do not deem it necessary to discuss assignments of error 1, 2 or 3.

The judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.

LAWSON, STAKELY, GOODWYN and MAYFIELD, JJ., concur.

LIVINGSTON, C. J., and SIMPSON, J., dissent.

SIMPSON, Justice (dissenting).

If the question were original I would concur in the majority opinion that the testimony with reference to Dr. Hughston was inadmissible as hearsay because the Hussey case seems to exposit the better rule.

But the question is not original and the rule of the Grammer case has prevailed in this jurisdiction for some fifteen years and was the governing rule of evidence which the trial Judge was required to follow in the instant case. And no doubt many other cases not brought up for review have also been governed by this latter case.

The rules of evidence touching the admissibility of expert testimony are not always exact, but at times somewhat adumbrant, and since the holding in the Grammer case does not impress me to be so unreasonable I would not overrule it.

I therefore respectfully dissent.

LIVINGSTON, C. J., concurs in the foregoing dissent.

On Rehearing.

PER CURIAM.

On further consideration of the matters treated on original submission, Justice Lawson joins with Chief Justice Livingston in concurring with the views expressed by Justice Simpson on original submission. Justice Mayfield concurs in the conclusion reached by Justice Simpson, but his views are stated in a concurring opinion which will be hereafter set out. It results, therefore, that the majority of the court now hold that the judgment of the trial court should not be reversed for the sole reason assigned in the court's opinion written on original submission. It follows, therefore, that other questions which were asserted by counsel for appellant as constituting reversible error but which were not treated on original submission must now be considered. These are assignments of error 1, 2 and 3. They are:

"1. The trial court erred in overruling the appellants' motion for new trial.

"2. The trial court erred in refusing to give to the jury the following instruction requested by the appellants in writing:

" '1. The court charges the jury that if you believe the evidence in this case you must find for the defendants.'

"3. The trial court erred in overruling the appellants' objection to the qualification of the venire of jurymen at the appellee's request as to whether or not any juror was an officer, agent or employee of the General Accident Insurance Corporation to which ruling of the court the appellants duly reserved an exception."

We treat them in chronological and reverse order.

Assignment No. 3. Appellants concede that it has been proper in the past for the jury panel to be asked whether or not any juror was an officer, agent or employee of a named insurance company, but insist that since January 1, 1952, the effective date of the Motor Vehicle Safety Re-

sponsibility Act, Title 36, § 74(42) et seq., Pocket Part, Code of 1940, such action is improper because of § 74(52), Title 36, Code of 1940, Pocket Part, of said act which provides:

"Neither the report required by section 74(45), the action taken by the director pursuant to this subdivision, the findings, if any, of the director upon which such action is based, nor the security filed as provided in this article shall be referred to in any way, nor be any evidence of the negligence or due care of either party, at the trial of any action at law to recover damages."

■ We cannot agree with this contention. There is no conflict in the section quoted above and Title 30, § 52, Code of 1940, and the rule of our cases holding that " ' "the plaintiff is entitled, upon his seasonable and proper motion, to have the jurors from whom the trial jury is to be selected qualified as to their relation to, or interest in, any insurance company which would be liable, in whole or in part, for any judgment that might be rendered against the defendant." ' " Fortson v. Hester, 252 Ala. 143, 39 So.2d 649, 651; Cox v. Bennett, 250 Ala. 698, 36 So.2d 86.

■ Assignment No. 2. The insistence that defendants were entitled to the affirmative charge with hypothesis is based on the contention that plaintiff was guilty of contributory negligence because he allegedly violated § 12(b), Title 36 of the code in that he did not give audible warning with his horn or other warning device before attempting to pass defendant's truck while proceeding in the same direction.

The collision occurred on Highway 169 between Opelika and Crawford around 2:30 in the afternoon. The weather was fair. The plaintiff was driving his own automobile and was accompanied by his service manager, Exton Black. The truck, which belonged to defendant Prince, was being driven by his foreman, defendant Shaneyfelt, who was accompanied by Henry Stevens and Eunice Edwards, two negro men. Both vehicles were traveling south, the truck in front of plaintiff's automobile.

The truck was partially loaded with sawmill slabs which were to be thrown off at Edward's home. The highway was on rolling terrain. The plaintiff topped a hill going 50 to 55 miles an hour when the truck was about halfway down the hill. He followed the truck 75 or 80 yards until he could see around the curve or far enough to be safe, and "then I pulled out to pass him, and there was no signal given * * * and as I got, well even with his almost front fender, without any warning, no signal, he cuts to the left at a side road there that led into his house I suppose." This road that the truck was turning to the left to enter was a private drive leading to Edward's house. The front left fender of the truck locked with the right front wheel of the automobile and the automobile turned over to the left, and plaintiff and Black were thrown clear of it. Defendant Shaneyfelt testified:

"Well, when I got about even with Rollo's house why I looked in my rear view mirror and I saw a car coming over the hill, but I thought it was plenty far enough behind me that I wouldn't have any trouble, but I give a left-hand turn signal and helt my hand way out so he could have seen it if he had been looking for it, and I helt my hand out until I had to take it off and put it on the wheel. * * * I slowed down but I don't ever drive very fast. * * * Well, I couldn't have been going over five miles a hour you know, making a square turn to the left, but I had slowed down until I was running I imagine something like ten or twelve just before I got to the turn-off, made the turn."

He further testified that he put both hands on the wheel and made the turn to the left of the pavement where the impact occurred. When he last looked back, plaintiff's car was in the right lane and Shaneyfelt did not know plaintiff was trying to pass. The horn was not sounded from the rear but it blew as the vehicles collided. Plaintiff and Black testified that they could not definitely say whether or not plaintiff sounded his horn. Stevens, the middle

man on the seat of the truck was a witness for plaintiff. He, Shaneyfelt and Edwards all testified the horn blew at or near the time of impact. Irrespective of the exact time the horn on plaintiff's automobile was sounded, we think a jury question was presented under the rule of Triplett v. Daniel, 255 Ala. 566, 52 So.2d 184, 186, where it was said:

"* * * If under the undisputed proof in the case there is a violation of § 17, Title 36, Code of 1940, then such violation constitutes negligence on the part of the plaintiff as a matter of law but it would still remain a question for the jury as to whether violation of the statute proximately contributed to her injury. Newman v. Lee, 222 Ala. 499, 133 So. 10; Newell Contracting Co. v. Berry, 223 Ala. 109, 134 So. 870.

"The case of Alabama Power Co. v. Buck, 250 Ala. 618, 35 So.2d 355, is not contrary to the principle here stated. In that case there was testimony tending to show that both the plaintiff and the defendant had violated statutory rules of the road. In that case it was a question for the jury as to whether the plaintiff's violation of the statute proximately contributed to his injuries or whether the defendant's violation of either one or both of two other statutes was the proximate cause of the accident.

"Holman v. Brady, 241 Ala. 487, 3 So.2d 30, involved the same principle, it being necessary that before any rights grew out of the violation of the statute, it was necessary for the jury to find from the evidence that such violation proximately contributed to the injuries which were claimed."

The trial court properly refused to give the affirmative charge with hypothesis.

■ Assignment No. 1. It is argued that the motion for a new trial should have been granted because the verdict was contrary to the evidence and because it was excessive. The first question is answered by Hamilton v. Browning, 257 Ala. 72, 57 So.2d 530, 536, where the court said:

"It is asserted that the trial court was in error in overruling the motion for a new trial because the verdict of the jury was contrary to the great weight of the evidence. Where there is evidence which, if believed, justified the verdict, the motion for a new trial is properly overruled. Johnson v. Louisville & N. R. Co., 240 Ala. 219, 198 So. 350; Kurn v. Counts, 247 Ala. 129, 22 So.2d 725. Verdicts are presumed to be correct and no ground of new trial is more carefully scrutinized or more rigidly limited than that the verdict is against the evidence. Cobb v. Malone, 92 Ala. 630, 9 So. 738. It is recognized by this court that when the presiding judge refuses, as here, to grant a new trial, the presumption in favor of the correctness of the verdict is strengthened. Bell v. Nichols, 245 Ala. 274, 16 So.2d 799; Southern R. Co. v. Kirsch, 150 Ala. 659, 43 So. 796; Smith v. Smith, 254 Ala. 404, 48 So.2d 546. See W. T. Smith Lumber Co. v. McKenzie, [256 Ala. 496] 55 So.2d 919. After allowing all reasonable presumptions in favor of the correctness of the verdict, we cannot say that the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust. Cobb v. Malone, supra."

Some of the rules applying to the amount of the verdict are contained in Montgomery City Lines v. Davis, 261 Ala. 491, 74 So.2d 923, 925, where the court, speaking through Justice Clayton said:

"The rule has often been stated in this court that a jury's award of damages cannot be disturbed unless so excessive or so grossly inadequate as to indicate passion, prejudice, corruption or mistake. It is also the rule that damages which may be awarded for pain and mental anguish are in large measure discretionary and unless the amount awarded is so excessive or inadequate as to indicate prejudice or

passion, they will not be reversed. 2 Alabama Digest, Appeal and Error, ☞1004(1), cites many cases supportive of this statement.

\* \* \* \* \* \*

"Reviewing court will substitute its judgment for that of the jury and trial court on the question of damages only if the amount is so excessive or so grossly inadequate as to be indicative of prejudice, passion, partiality or corruption on the part of the jury. Alabama Great Southern R. Co. v. Baum [249 Ala. 442, 31 So.2d 366], supra; Birmingham Electric Co. v. Lawson, 239 Ala. 236, 194 So. 659; Cobb v. Malone, supra; Sorrell v. Lindsey, 247 Ala. 630, 25 So.2d 725."

We do not think the amount of the verdict, $15,000, was excessive under the principles stated supra.

Having treated all the argued assignments of error, the application for rehearing is granted and the judgment of the lower court should be and is affirmed.

Application for rehearing granted.

Affirmed.

LIVINGSTON, C. J., and LAWSON and SIMPSON, JJ., concur.

MAYFIELD, J., concurs specially.

STAKELY, GOODWYN and MERRILL, JJ., dissent as to that part of the opinion holding admissible the evidence considered by the court in the original opinion.

MAYFIELD, Justice (concurring specially).

I am of the opinion that the logic of Mr. Justice MERRILL'S opinion is unassailable and that the doctrine in the case of Grammer v. State, 239 Ala. 633, 196 So. 268, should be expressly overruled and no longer followed by the bench and bar of this State.. But I am not convinced and persuaded that the action of the learned trial judge in following the Grammer case, supra, which was clearly the law of Alabama at the time of the trial, and the admission of cumulative evidence under the authority of this case, was error of sufficient magnitude to substantially affect the outcome of the trial. For this reason, I am of the opinion that the judgment of the lower court should be sustained.

MERRILL, Justice (dissenting).

This is a very peculiar decision. As I understand it, all seven Justices agree that the original opinion states "the better rule", that the testimony with reference to what Dr. Hughston "said", "thought", "was afraid to" and "concurred in", was hearsay and that the holding in the Hussey case is sound. It appears that four of us, a majority, hold that the Grammer case, supra, is overruled and the original opinion correctly states the law to be followed in the future, but four members of the court, also a majority, hold that the law as set out in the original opinion does not apply to this particular case, insofar as the result is concerned, or, to express it another way, the majority thinks the judgment in the instant case should be affirmed, but warns that the next case on the same law and the same facts will be reversed.

Section 43 of our constitution provides for the distribution of powers of government "to the end that it may be a government of laws and not of men." This decision appears to be opposed to the "end" at which the quoted part of § 43 seems to be aimed.

The original dissent by Justice SIMPSON, together with the concurring opinion of Justice MAYFIELD, has now become the majority insofar as the result is concerned, and as I understand that original dissent, it is based on the doctrine of stare decisis because "the rule of the Grammer Case has prevailed in this jurisdiction for some fifteen years and was the governing rule of evidence which the trial Judge was required to follow in the instant case."

All judicial decisions are by necessity ex post facto. If we followed the rule of

stare decisis as contended for by the majority, no case would ever be overruled by this court irrespective of how wrong, improper or ill-conceived it might have been, because as stated by the majority, "no doubt many other cases not brought up for review have also been governed by this latter [the Grammer] case." But consider the case of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, a judicial landmark in our jurisprudence. There the Supreme Court of the United States overruled Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, which had been followed in many cases for 96 years. And incidentally that decision reversed a judgment in favor of the plaintiff for $30,000, which was twice the amount of the judgment in the instant case. We know of no responsible authority who contends now that Erie R. Co. v. Tompkins is wrong or that the Supreme Court of the United States should not have decided as it did because the lower court and the circuit court of appeals followed Swift v. Tyson, supra, which had been the law for 96 years, or that the judgment in the Erie case should not have been reversed because the plaintiff had secured one for $30,000 by following Swift v. Tyson, supra, and all the cases which followed it. Verily, a majority of this court has added a new and strange concept to records of judicial pronouncements.

A fine statement expressing the proper limits on the applicability of the doctrine of stare decisis is found in Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, where the court said:

"We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience."

In 14 Am.Jur., "Courts", § 82, we find:

"In a number of cases it has been said that a single decision will not afford a basis for the application of the doctrine of stare decisis, and in other cases courts have refused to apply this doctrine without emphasizing the fact that there had been but a single decision on the point;"

and in 21 C.J.S., Courts, § 186, p. 301, we read:

"A single decision, however, is not necessarily binding, under the rule of stare decisis, especially where it has not been cited for many years; and this rule will not be applied where the decision is in conflict with prior decisions, * * *."

The Supreme Court of Louisiana in Miami Corporation v. State, 186 La. 784, 173 So. 315, 320, quoted approvingly from another case as follows:

" ' "The rule of stare decisis is entitled to great weight and respect when there has been, on a point of law, a series of adjudications all to the same effect; but when we are presented with a single decision, which we believe to have been inadvisedly made, it is incumbent on us to overrule it, if we entertain a different opinion on the question submitted." ' "

That opinion also says that "it must be remembered that only seldom can a single decision serve as a basis for stare decisis, and never where opposed to previous decisions, and especially where such previous decisions are overruled without being referred to, as if having escaped altogether the attention of the court." These principles are especially appropriate in reference to the Grammer case because as we stated in the original opinion, "the quoted part of the Grammer case has not been followed by this court since it was announced" in 1940; it overruled the Hussey case without referring to it; and it is a fair assertion to make that the Hussey case escaped the attention of the court when the Grammer case was being considered.

But what has this court done and said about overruling cases which have been followed by this court and recently so?

In Hand v. Stapleton, 145 Ala. 118, 125, 39 So. 651, where this court *twice* previously in the *same* case had construed the *same* local act the *same* way and then reversed the two previous holdings, the opinion begins:

"Simpson, J. The decision of this case depends in a large measure on the construction to be given to the act of February 5, 1901, for the removal of the county seat of Baldwin county. Acts 1900–01, p. 754. As this matter has been before this court twice, and the decisions concur in the construction of this act, the construction which this court has placed upon said act should not be disturbed, unless there are cogent reasons for holding that the former construction was erroneous; but the magnitude and importance of the interests involved, and the fact that the last decision was by a divided court, suggest that it is proper to re-examine the question."

It should be remembered that the decision in the Grammer case was by a divided court.

The recent case of Redwine v. Jackson, 254 Ala. 564, 49 So.2d 115, 125, overruled Warner v. Warner, 248 Ala. 556, 28 So.2d 701, and Justice Lawson, speaking for the majority, said:

"There is no doubt that the holding in the Warner Case here involved is contrary to the legislative intent as well as to the rule which this court had consistently followed prior thereto. True, this court should do all within its power to follow a consistent course. But where, as here, it is apparent that a holding which has been in the books only a comparatively short time is clearly wrong, and upsets a rule of long standing, we feel that this court should not hesitate to depart therefrom. We are fully con-vinced that the rule of the case of Warner v. Warner, 248 Ala. 556, 563, 28 So.2d 701, with which we are here concerned, should be overruled and no longer followed. This, of course, applies to the few equity cases which have followed Warner v. Warner, supra, in this respect, which include Adams v. Griffin, [253 Ala. 371] 45 So.2d 22; Crum v. Crum, [253 Ala. 163] 43 So.2d 392."

The Redwine case shows that the Warner case was followed at least in the two cases cited. Yet the Grammer case, which apparently is clearly wrong and upsets a rule of fifty–two years standing and has never been followed by this court, should not be overruled because "The rules of evidence touching the admissibility of expert testimony are not always exact, but at times somewhat adumbrant".

It being impossible in my mind to justify the holding of the majority on the grounds stated, I must of necessity dissent.

STAKELY and GOODWYN, JJ., concur.